USDC SCAN INDEX SHEET

















TKL   10/11/05   13:12

3:05-CR-00343   USA V. MAYER

*79*

*CRRESP.*

ORIGINAL

1 | BENJAMIN L. COLEMAN
California State Bar No. 187609
2 | 433 G Street, Suite 202
San Diego, California 92101
3 | Telephone No. (619) 652-9970
Facsimile No. (619) 652-9964
4
Attorney for Defendant David Cary Mayer
5
6
7



FILED

OCT - 7 2005

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                        DEPUTY

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 | **(HONORABLE JEFFREY T. MILLER)**

11

12 | UNITED STATES OF AMERICA,      )      Criminal No. 05CR0343-JM
                                   )
13 |           Plaintiff,          )      Date:    October 19, 2005
                                   )      Time:    9:00 a.m.
14 | v.                            )
                                   )      **REPLY MEMORANDUM**
15 | DAVID CARY MAYER (1),         )
                                   )
16 |           Defendant.          )
                                   )
17 | _____   )

18 | **PRELIMINARY STATEMENT**

19 |        Defendant, David Cary Mayer, respectfully submits the following Reply Memorandum to

20 | address arguments made in the Government's Supplemental Response and Opposition to Defendant's Motions

21 | to Dismiss the Indictment ("GSR"). The deference that the government is sometimes afforded leads it to

22 | believe that it can get away with the most absurd legal and factual misrepresentations, as long as they are

23 | asserted with enough authority. It is distressing that the government sometimes attempts such maneuvers, as

24 | it has a special duty to seek justice by being candid with the Court. *See, e.g., Berger v. United States*, 295

25 | U.S. 78, 88 (1935). Unfortunately, this special duty of the government has been violated here. Put simply,

26 | this entire case, from the investigation conducted by the Federal Bureau of Investigation ("FBI") to the less

27 | than credible representations made before this Court, stinks of bad faith. Accordingly, this case should be

28 | dismissed.

1                                                    05CR0343

**STATEMENT OF FACTS**

Based on the discussion and representations at the last motion hearing, Mr. Mayer confined his supplemental motion to dismiss to the issue focused on by the Court: what facts did the FBI know about Jeffrey Devore at the time of the 2004 convention and how do those facts bear on the legal arguments that have been presented. Despite this narrow focus, the government has responded with a 30-page brief, with a 32-paragraph declaration by FBI Agent John Caruthers, addressing a myriad of issues.[1]  The factual representations, which are obviously not limited to the Devore situation, are simply incomplete and purposefully misleading. As a result, Mr. Mayer feels obliged to respond.

The government starts its recitation with its mantra, that the FBI "never investigated NAMBLA as an organization[,]" GSR at 4, and once again claims that this story begins in 2001. The government knows that this is not exactly true. The discovery reveals that the FBI has been attempting to take down NAMBLA for years. In 1994, John Walsh, who has close connections to the FBI, bragged on his well-known television show, *America's Most Wanted*, that "he and the FBI ha[ve] tried for years to stop NAMBLA." Ex. A. Indeed, "[t]he FBI and local law-enforcement agencies have been trying for years to find NAMBLA in violation of laws against the sexual exploitation of children. The most organized attempt, which included a year of police infiltration in the mid 1980s, produced nothing, and the U.S. Senate Permanent Subcommittee on Investigations found that NAMBLA did not engage in criminal activity." Ex. B.

With this history as a backdrop, the events of 2001 can be discussed. The government now claims that Agent Hamer joined NAMBLA in 2001 because he was investigating "sex tourism to Thailand" and wanted "to understand the mindset of so-called 'boy lovers.'" GSR at 4. This representation is quite different from the representation contained in the initial government response. Previously, the government implied that Hamer joined NAMBLA as part of a particularized investigation of specific individuals who were traveling to Thailand to have sex with boys. Now, it appears that there was no specific investigation of particular individuals underway and instead Hamer had some generalized investigative interest in the sex tourism industry in Thailand. To this date, the government has not produced one piece of discovery regarding

---

[1]      Caruthers' declaration does not comply with Local Rule 47.1(g), as it is not based on personal knowledge and is instead based almost entirely on hearsay information.  It is perplexing that the government would submit an improper declaration from Agent Caruthers when it could have easily submitted a proper declaration from the agent conducting the undercover operation, Robert Hamer.

1  this supposed investigation of sex tourism in Thailand. One can only wonder whether such an investigation
2  really existed.

3          In any event, the government maintains that Hamer joined NAMBLA so that he could
4  understand the "mindset" of "boy lovers." It is not clear why it was necessary for Hamer to understand the
5  "mindset" of "boy lovers" in order to conduct his supposed investigation of sex tourism in Thailand.[2]
6  Moreover, for years, the FBI has employed numerous behavioral and psychological experts who frequently
7  opine on the "mindset" of pedophiles. *See, e.g., United States v. Weber*, 923 F.2d 1338, 1341 (9th Cir. 1990).
8  There is also extensive literature, much of which has undoubtedly been generated by the Department of
9  Justice, explaining the "mindset" of pedophiles. Put simply, the "mindset" excuse does not pass the straight
10  face test. In reality, this was a "fishing expedition."

11          Perhaps more than coincidentally, shortly before Hamer began to pursue his supposed
12  "mindset" exploration, a civil lawsuit was filed against NAMBLA and some of its leaders. *See* GSR at 5 n.2.
13  Hamer apparently read numerous articles about the lawsuit, including one by the plaintiff's attorney (of
14  course, not necessarily the most reliable source). *See* Ex. 1 (to GSR). The lawsuit stems from the tragic death
15  of a young boy, killed almost ten years ago. While the case's origin is no doubt tragic, it has little legal merit.
16  The complaint alleges that the killer accessed the NAMBLA website from the Boston public library shortly
17  before the murder. There has been no indication that this allegation is in fact true. Moreover, NAMBLA's
18  website is available to all on the internet, and nobody, including the government in this case, has pointed to
19  any specific part of the website which contains anything other than protected speech. The plaintiffs are
20  represented by attorneys with the Thomas More Foundation, a right-wing organization committed to restoring
21  Christian values in the United States. *See* Ex. C. The group's involvement appears to be an effort to "out"
22  NAMBLA members and dismantle the organization. The ACLU is assisting the defense. The lawsuit against
23  NAMBLA as an organization did not survive a motion to dismiss, although the claims against the individual
24  defendants have been allowed to proceed for the time being. *See Curley v. NAMBLA*, No. 00-10956-GAO,
25  2003 WL 21696547 (D. Mass. 2003).

26          In any event, the government maintains that Hamer joined NAMBLA to learn about the
27

28          [2]    Why wasn't Hamer investigating the "mindset" of "girl lovers?" Certainly, the sex tourism
industry in Thailand is not limited to homosexual conduct.

1  "mindset" of pedophiles, not because of the lawsuit, and so that is how this discussion will proceed.

2  Assuming a government agent has infiltrated an organization in an attempt to learn about the "mindset" of

3  pedophiles so that he can investigate sex tourism in Thailand, what would he would do?  In this case, he

4  would write Christmas cards to prisoners. *See* Ex. 1 (to GSR).  Hamer did this for two years, making certain

5  that he collected and catalogued the names and convictions of the recipients of the cards. *See* Ex. D.  One can

6  only wonder what information Hamer gained about the "mindset" of pedophiles by sending these Christmas

7  cards and what effect this information had on the Thailand sex tourism investigation, which presumably

8  continued to plod along during this two-year period.[3]

9         In 2003, Hamer got his big break.  He was invited to attend NAMBLA's convention in New

10  York City.  By this time, it appears that the supposed sex tourism investigation was over, and the government

11  maintains that the purported excuse for Hamer's attendance at the meeting is that he learned that Joe Power

12  would be attending. *See* Ex. 1 (to GSR).  All the government has said about Power is that he had previously

13  sustained convictions for sex offenses.  The government still does not say when these convictions occurred

14  and why it was necessary to investigate Power at this time.[4]  Despite the rhetorical questions previously posed

15  in Mr. Mayer's initial reply memorandum, the supposed investigation of Power, like the supposed Thailand

16  investigation, remains a mystery.

17         Hamer attended the 2003 convention, armed with hidden audio and video equipment.  Again,

18  there is no explanation as to why this was necessary.  As mentioned previously, Hamer did not simply observe

19  Power but instead catalogued any personal information that he could obtain about anyone attending the

20  convention. *See* Ex. F.  That information was then passed along to FBI field offices around the country, even

---

22  [3]     The government distorts NAMBLA's Christmas card program in an unclear effort to support
its arguments.  NAMBLA openly advertises its correspondence program with prisoners on its website. *See*
23  Ex. E.  NAMBLA's "prisoner program seeks to provide moral support to incarcerated boy-lovers.  These
people experience a harsh and exceptionally hostile environment which undermines their self-concepts and
24  self-respect." Ex. E.  The government seems to characterize the FBI's discovery that the overwhelming
majority of prisoners that Hamer sent cards to were convicted of sex offenses as some important evidentiary
25  development. *See* GSR at 5.  That, however, is the entire point of the program, and NAMBLA has not in any
way kept it a secret.  The government also imprecisely characterizes the prisoners as NAMBLA members.
26

27  [4]      Without elaboration, the government does mention that Power was a named defendant in the
civil lawsuit. *See* GSR at 6.  Power was named as a defendant simply because of his leadership role in
28  NAMBLA.

1   if there was no indication that the person had ever done anything illegal, so that the individuals could be

2   investigated. *See* Ex. F; Ex. 1 (to GSR).

3           During the convention, Hamer claims that he went with other members to a toy store to look

4   at boys. Conveniently, this supposed trip was not recorded. Hamer claims that, during this trip, some

5   members talked about wanting to have sex with the boys. *See* Ex. 1 (to GSR). There is no indication that any

6   member acted on these desires or indicated that he would act on these desires. Of course, Hamer's attendance

7   at the convention did not produce any information about Power, the supposed reason for his attendance. The

8   sum total of the information that Hamer gathered is the following information about three members. First,

9   he found out that a member from New Jersey had been charged with a sex crime over twenty years ago, but

10   the case was ultimately dismissed after three hung juries. *See* Ex. 1 (to GSR). Second, Hamer found out that

11   another member likes to sit at his computer in his boxer shorts and that this individual gets aroused if he

12   knows he is chatting with a boy on the internet. *See* Ex. F. Third, as discussed at length in previous

13   submissions, he found out information about Devore. Given the staleness and vagueness of the facts

14   regarding the first two individuals, the only information of any potential substance was regarding Devore.[5]

15           After the convention, Hamer began his undercover investigation of Devore. Devore was

16   immediately eager to share thoughts with Hamer. On November 10, 2003, Devore sent an e-mail to Hamer

17   asking whether he wanted to get "together socially" so that he could "sort through this aspect" of his life. Ex.

18   G. Hamer and Devore met in December 2003; they also met on at least two other occasions. The two were

19   in fairly frequent telephone and e-mail contact. During the meetings, Devore confided in Hamer, providing

20   him with extensive information about his sexual indiscretions and tendencies. None of the information

21   provided by Devore implicated any other NAMBLA members. Given the extensive meetings and discussions,

22   the FBI was able to track Devore. The FBI knew his car's license plate number, where he lived, where he

23   worked, his telephone number, and his e-mail account.

24

---

25     [5]     The government states that the members talked about their "sexual encounters" outside of the

26   meetings, *see* Ex. 1 (to GSR), but these three items are the only specifics that the government has produced
regarding such conversations at the 2003 convention. The government also asserts that Hamer observed little

27   discussion at the 2003 convention about changing age of consent laws. *See* Ex. 1 (to GSR). Hamer, however,
participated in the discussions of the privacy committee, *see* Ex. 1 to (GSR), which is focused on maintaining

28   the members' privacy, not the more general topic of changing age of consent laws. The issue of changing age
of consent law was discussed at length at the 2004 convention.

1       Although the only concrete information that Hamer had developed in his three-year infiltration
2  concerned Devore, he nonetheless stepped up his activity in NAMBLA.  After attending the 2003 convention,
3  Hamer began writing articles for the NAMBLA bulletin, including one describing his first convention.  *See*
4  Ex. H.  In the article, Hamer described his initial fear of being arrested and how he was eventually able to
5  relax and enjoy the special bond that he developed with the members.  Hamer spoke of the pride that he felt
6  in the organization's twenty-five year history, and he applauded the leaders who had fought on the front lines
7  throughout the years.  In his article, Hamer  described NAMBLA as "an organization protected by the 1st
8  Amendment."  Ex. H.  In addition to publishing articles for NAMBLA, Hamer began drafting policy for the
9  organization's privacy committee, which he provided to Peter Melzer, the leader of NAMBLA.  Ex. I.  He also
10 suggested that he could host the next convention in San Diego.  Ex. I.  In short, Hamer began to take a
11 leadership role in shaping the organization.

12      Hamer, now an active member, was invited to the 2004 convention.  The invitation stated that
13 the convention was from Friday, November 12, 2004 to Sunday, November 14, 2004.  Ex. J.  Although the
14 government has maintained that the reason for his attendance at the conference was Devore, it now concedes
15 that he received an e-mail from Devore weeks before the conference in which Devore stated that he would
16 not be attending.  *See* Ex. 1 (to GSR).  Nevertheless, Hamer attended, once again armed with hidden audio
17 and video equipment.  This time, he was accompanied by Agent Caruthers.

18      On the first day of the convention, Friday, November 12, 2004, Hamer claims that he spoke
19 with Mr. Mayer about traveling to Thailand to have sex with boys.  *See* Ex. 1 (to GSR).  Nothing audible on
20 the recordings corroborates this claim.  In its brief, the government claims that Mr. Mayer initiated the
21 conversation, *see* GSR at 7, but Caruthers' declaration does not make this allegation.  *See* Ex. 1 (to GSR).
22 No specific details of the alleged conversation are presented by the government.

23      During the second day of the conference, Hamer initiated the subject of traveling to meet boys
24 with Mr. Mayer and codefendant Phillip Todd Calvin, stating: "Todd, have, you traveled much?  I mean, with
25 your plane, is, is that a way to, to meet boys?  Do you, do you do that?"  Ex. K.  Calvin responded that he
26 travels frequently but had no success in finding boys and is "scared to death" to do so.  Ex. K.  During this
27 portion of the conversation, Mr. Mayer appears to be more concerned with his attraction to an adult male,
28 believed to be codefendant Paul Zipszer, exclaiming how he wants to play with his muscular chest.  Ex. K.

1 Hamer, however, proceeded to ask Mr. Mayer if he has traveled.[6] After Mr. Mayer responded affirmatively,

2 Hamer suggested: "That's what we need to do, is just put together a travel group. Cause, even jokingly, I

3 mean it, this is the most paranoid group of people I've ever been around, and I mean, I'm cautious, but it's

4 like, OK, let's go, you know." Ex. K. With the exception of the discussions initiated by Hamer, no criminal

5 activity was promoted, instigated, or suggested during the convention. Indeed, the audio recordings produced

6 by the government in discovery, and the minutes of the convention, *see* Ex. L, reveal an organization that is

7 attempting to comply with all laws while fighting for its very survival. The convention focused on the

8 organization's goal of changing age of consent laws, while also assessing the financial and legal state of the

9 organization. As one would expect, there was also much discussion about how the organization could be

10 improved.

11       As has been well documented, Hamer then initiated the supposed trip to Mexico in the months

12 following the convention.

13 **ARGUMENT**

14 **I.**

15 **NAMBLA IS A PROTECTED ORGANIZATION UNDER THE FIRST AMENDMENT.**

16       The government faults the Court for "assuming" that NAMBLA was protected by the First

17 Amendment. GSR at 10. Of course, the government never contended otherwise in its initial response to the

18 motion to dismiss. The government's previous failure to dispute this issue corresponded with the affidavits

19 submitted in support of the search warrants executed in this case, which conceded that NAMBLA was an

20 organization protected under the First Amendment. *See* Ex. A (attached to Mr. Mayer's original motions).

21 Now, for the first time, the government contends that NAMBLA is not protected by the First Amendment.

22 *See* GSR at 10-14. The government, however, is bound by the judicial admissions contained in its affidavits,

23 *see, e.g., United States v. Bentson*, 947 F.2d 1353, 1356 (9th Cir. 1991), and has otherwise waived this

24 argument by failing to raise it in a timely manner. *See, e.g., Steagald v. United States*, 451 U.S. 204, 208-11

25 (1981). In any event, this last-second argument is without merit, as it conflicts with the very cases that the

26 government cites and manifests a fundamental misunderstanding of First Amendment jurisprudence.

27 ───────────────

28     [6]    It is not clear why Hamer has to ask the question if, as the government maintains, he had already ascertained this information the previous night.

1         In supposed support of its argument, the government cites three NAMBLA cases. *See* GSR

2  at 10-11. Two of the cases require little discussion. The first case, *People v. Roettgen*, No. B168984, 2004

3  WL 1302656 (Cal. Ct. App. Jun. 14, 2004), is an unpublished opinion from an intermediate state appellate

4  court. Besides the fact that it is misconduct to cite an unpublished opinion, the decision has nothing to do

5  with whether NAMBLA is protected by the First Amendment. Instead, the only issue was whether a

6  NAMBLA bulletin was properly admitted into evidence. The second case, *United States v. Tampico*, 297 F.3d

7  396 (5th Cir. 2002), actually states that NAMBLA membership falls within the protections of the First

8  Amendment. *Id.* at 403 ("Tampico is within his First Amendment rights in belonging to NAMBLA"). Thus,

9  it is strange that the government would cite it as supporting its position.

10        The third NAMBLA case cited by the government, *Melzer v. Board of Education of the City*

11  *School District of the City of New York*, 336 F.3d 185 (2d Cir. 2003), deserves more attention given the

12  troubling lack of candor with which it is treated by the government. The Second Circuit's decision in *Melzer*

13  addressed the termination of Peter Melzer, the current leader of NAMBLA, from his position as a teacher at

14  the Bronx High School of Science in New York City. The government isolates various quotations, taken

15  completely out of context, to suggest that the Second Circuit found that Melzer and his organization engage

16  in and instigate criminal activity, and therefore NAMBLA is not protected under the First Amendment. It

17  appears that the factual basis for the government's claim that NAMBLA instigates criminal activity is the

18  Second Circuit's reference to a select few articles which appeared in the organization's bulletin over a decade

19  ago. *See* GSR at 10, 14. The Second Circuit, however, could not have been any clearer that these isolated

20  articles from years in the past did not diminish NAMBLA's protected status:

21        Appellant's rights are not diminished by the fact that, as the Commissioner's investigation report states, some of NAMBLA's publications could be read

22        as an "instruction manual" for illegally molesting children and can "reasonably be assumed to have led to abuse." Under our system an individual cannot be

23        punished for associating with an organization or engaging in advocacy, absent a clear showing either that the organization is actively engaged in illegal

24        activity or the advocacy is "directed to inciting or producing imminent lawless action that is likely to incite or produce such action."

25

26        Even were it shown on this record – *and it is not* – that some of NAMBLA's members engage in illegality, or that the organization's aims are in fact illegal,

27        Melzer himself could not be punished absent clear proof – *also not present here* – that he knew of such illegal aims and specifically intended to accomplish

28        them. Because we assume that Melzer's First Amendment activity possesses the highest value, it therefore places a heavy burden on the Board to justify dismissal.

1   *Melzer*, 336 F.3d at 198 (citations omitted) (emphases added).[7]

2          In short, the Second Circuit found that, despite the isolated articles relied upon by the

3   government, NAMBLA is a protected organization under the First Amendment. Actually, the Second Circuit

4   did not even think it was a close call. *See Melzer*, 336 F.3d at 195 ("Membership in NAMBLA was, *surely*,

5   an associational activity. . . . Thus, interconnecting associational and speech rights are in play.") (emphasis

6   added). The Second Circuit explained: "NAMBLA's stated goal is to effect change in attitudes and laws

7   regarding age of consent. The bulk of Melzer's activity, advocacy, and speech support this goal. Advocacy

8   for a change in public perception and law, a fundamental component of democracy, is certainly a matter of

9   public concern, regardless of the underlying subject matter." *Id.* at 196. Accordingly, the Second Circuit

10  repeatedly characterized Melzer's conduct with NAMBLA as "protected First Amendment activity." *Id.* at

11  197. Indeed, the conclusion of the opinion states: "In sum, appellant's freedom to associate with and advocate

12  for NAMBLA is protected by the First Amendment." *Id.* at 200. It is frankly hard to imagine that the

13  government could possibly claim that *Melzer* supports its argument that NAMBLA is not a protected

14  organization.[8]

15         While the Second Circuit's opinion flatly refutes the government's claim, it is also important

16  to note that the government's argument suffers from a fundamental misunderstanding of First Amendment

17  jurisprudence. This misunderstanding is manifested by the government's reliance on First Amendment *speech*

18  cases, as opposed to First Amendment *association* cases. *See* GSR at 12-13. Even if it were appropriate to

19  rely on the cited speech cases, the government nevertheless misrepresents the basic First Amendment doctrine

20  articulated in those decisions. Specifically, the government fails to mention the key First Amendment phrase:

21  "*imminent* lawless action." Indeed, "[n]othing could be clearer at this stage in the development of first

22

23       [7]      The Second Circuit added that "the record before us reveals no evidence that [Melzer] engaged

24  in any illegal or inappropriate conduct at Bronx Science." *Melzer*, 336 F.3d at 189.

25       [8]      After explaining that association with NAMBLA is clearly protected by the First Amendment,
    the Second Circuit ultimately concluded that Melzer's termination was permissible, but only because the

26  school board was able to satisfy its heavy burden under a somewhat modified *Pickering v. Board of
    Education*, 391 U.S. 563 (1968) test. *See Melzer*, 336 F.3d at 200 ("The Board nonetheless meets its burden

27  under *Pickering* by demonstrating that plaintiff's association and his degree of active involvement in
    NAMBLA caused disruption to the school's mission and operations justifying the Board's action terminating

28  him.").

1  amendment jurisprudence than 'the principle that the constitutional guarantees of free speech and free press

2  do not permit a State to forbid or proscribe advocacy of law violation except where such advocacy is directed

3  to inciting or producing imminent lawless action and is likely to incite or produce such action.'" *United States*

4  *v. Dahlstrom*, 713 F.2d 1423, 1428 (9th Cir. 1983) (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)).

5  In *Dahlstrom*, the Ninth Circuit found that the defendants' speech was protected under the First Amendment,

6  explaining that "[n]othing in the record indicates that the advocacy practiced by these defendants

7  contemplated *imminent* lawless action." *Id.* at 1428 (emphasis in original).

8        The government has not even attempted to argue that the advocacy practiced by NAMBLA

9  contemplated *imminent* lawless action.[2]  Actually, as mentioned previously, all the government has done is

10  point to articles that were published in NAMBLA's bulletin well over a decade ago.[10]  Given that "[t]he

11  NAMBLA *Bulletin* is published ten times a year[,]" *Melzer*, 336 F.3d at 190, and given that the most recent

12  article pointed to by the government was published in 1993, *id.* at 190, there have been approximately 120

13  issues of the *Bulletin* that have been published since that time.  Of course, each issue contains numerous

14  articles.  The government has not pointed to one article within the last 120 issues which instigated any

15  criminal activity, let alone *imminent* lawless action.  Moreover, the government has not pointed to any fact

16  indicating that the select few challenged articles from the 1980's and early 1990's instigated any criminal

17  activity whatsoever, let alone *imminent* criminal activity.  And, as mentioned previously, a Senate

18  subcommittee has found that NAMBLA does not engage in criminal activity

19        Actually, the only criminal activity that the government can point to that was allegedly

20  instigated by NAMBLA is that of codefendant Zipszer.  *See* GSR at 11-12.  It is absurd that the government

21  would point the finger at NAMBLA, which specifically advised Zipszer not to break any laws, when it was

22  Hamer who was the person most responsible for inducing Zipszer to engage in any criminal activity.  Indeed,

23

---

24     [2]  Although not with respect to this point, the government does reference the civil lawsuit filed

25  against NAMBLA, which alleges that the killer of a young boy accessed the NAMBLA website from the
Boston public library shortly before the murder.  There has been no indication that this allegation is in fact

26  true.  Moreover, NAMBLA's website is available to all on the internet, and the government has not pointed
to any specific part of the website which is likely to incite *imminent* lawless action.

27

28     [10]  Of course, the government has not presented the actual articles and has simply relied upon a
shorthand description of them.

1  there is no evidence indicating that Zipszer engaged in any criminal activity in the months following the

2  NAMBLA convention until Hamer instigated the conduct underlying the indictment.

3          In sum, the law is clear that NAMBLA is a protected organization.  That is why the

4  government conceded the issue before.  Now that the government has realized that its investigation is

5  fundamentally flawed, it is has resorted to grasping at straws.

6                                          **II.**

7                     **THE FBI LACKED ADEQUATE SUSPICION.**

8          **A. There Is A Suspicion Requirement**

9          Once again, the government raises a new argument.  The government now claims that the FBI

10 did not need any level of suspicion before infiltrating NAMBLA.  *See* GSR at 14-20.  Because the government

11 did not make this argument before, it should be deemed waived given its untimeliness.  *See, e.g., Steagald*,

12 451 U.S. at 208-11.  In any event, the argument is without merit.

13         The government concedes that *Gibson v. Florida Legislative Investigation Committee*, 372

14 U.S. 539, 557 (1963) establishes that the government must demonstrate a requisite level of suspicion before

15 conducting an investigation that would substantially intrude upon and severely curtail or inhibit associational

16 rights.  *See* GSR at 14 ("While we agree that *Gibson* dictates such a requirement, it did so in a limited context

17 not relevant here: when such an investigation would substantially intrude upon and severely curtail or inhibit

18 constitutionally protected activities.").  The government's only complaint is that while such rights were

19 intruded upon in *Gibson*, where the organization's membership lists were subpoenaed, no such rights were

20 inhibited here.  *See* GSR at 16.  The government's argument makes little sense.

21         First, as an initial matter, what Agent Hamer and the FBI did in this case is the same thing as

22 subpoenaing a membership list, only worse. Agent Hamer infiltrated the NAMBLA conventions and collected

23 personal information about its members.  He then sent the personal information about NAMBLA members

24 to FBI field offices throughout the country in an effort to collect more information about these individuals.

25 In other words, Hamer and the FBI were attempting to obtain a membership list, just in a covert manner.  The

26 fact that these efforts were done covertly makes the infringement on First Amendment rights even worse than

27 that in *Gibson*.  At least in *Gibson*, the organization was able to use the judicial process to challenge the

28 efforts to obtain information about its members.  Here, on the other hand, NAMBLA was given no such

1 opportunity to protect the identity of its members.

2      Second, the government seems to forget that Agent Hamer infiltrated the NAMBLA

3 conventions *with hidden audio and video equipment*. Without their permission, Hamer captured the members'

4 thoughts and impressions about sensitive topics.  Given the sensitive and unpopular nature of the topics

5 discussed by NAMBLA, the organization and its members have repeatedly expressed a desire for privacy.[11]

6 Any organization, certainly an unpopular one, would lose substantial membership if it was revealed that the

7 members' thoughts and ideas were being secretly recorded by government officials.  How can the government

8 possibly contend that it is not a substantial infringement on First Amendment rights for the government to

9 send an undercover agent into a protected organization's annual convention with hidden recording equipment?

10      Third, while at the convention, Agent Hamer instigated criminal activity contrary to

11 NAMBLA's stated purpose and policy.  During one meeting, he made mocking comments, designed to

12 promote criminal activity.   Agent Hamer continually made attempts to undermine the goals of the

13 organization. This is a substantial infringement on associational rights.

14      Fourth, the government seems to forget that Agent Hamer took an active role in various

15 leadership positions in the organization.  Ironically, he took a leadership role in the organization's privacy

16 committee.  In other words, Hamer was taking an active role in shaping the direction of the organization on

17 important matters, such as the members' privacy.  He also was in charge of organizing the 2005 convention.

18 It is hard to think of more infringing behavior than a government agent, who does not have the best interests

19 of the organization in mind, taking an active role in shaping policy for the organization.  Indeed, the agent was

20 blatantly frustrating the goal of the organization (privacy).

21      In short, the government's attempt at distinguishing *Gibson* is absurd.  The government's

22 investigation in this case constituted a much greater infringement on First Amendment rights than the

23 investigation in *Gibson*.  Given that the government does at least concede that *Gibson* requires suspicion for

24 investigations that infringe on associational rights, it is clear that a requisite level of suspicion is required here.

25 **B. The Appropriate Standard Is Probable Cause**

26      The government claims that, if suspicion is required, the standard should be reasonable

27 _____

28    [11]      The convention was listed at the hotel under a false name, and, as mentioned previously, some
members used false names to protect their privacy.

1  suspicion, not probable cause. *See* GSR at 24-25. However, as stated previously by Mr. Mayer, the Supreme

2  Court's opinion in *Gibson* suggests that the appropriate standard is probable cause. *See Gibson*, 372 U.S. at

3  546 ("this case hinges entirely on the question of whether the evidence before the Committee was sufficient

4  to show *probable cause* or nexus between the N.A.A.C.P. Miami Branch, and Communist activities")

5  (emphasis added). Accordingly, probable cause is the standard that should be employed by the Court,

6  particularly when the government has failed to cite any authority to support its contrary position.[12]  In any

7  event, as Mr. Mayer has previously maintained, even if the government's unsupported position were correct,

8  it would not change the outcome, as the facts of this case do not even satisfy the lesser reasonable suspicion

9  standard.

10  ### C. Adequate Cause As To Devore Was Lacking

11  As the Court is well aware, the government has previously maintained that the cause for the

12  2004 infiltration was Devore. The government now concedes that Devore informed Hamer weeks before the

13  convention that he would not be attending, but claims that Hamer thought Devore may be lying to him. The

14  government maintains that Hamer could only know for sure that Devore would not attend by going to the

15  convention and checking for himself. This is absurd.

16  First, the government's reasoning conflicts with the Ninth Circuit's instruction that such

17  "damned if you do, equally damned if you don't" reasoning cannot be used to establish adequate suspicion.

18  *United States v. Montero-Camargo*, 208 F.3d 1122, 1136 (9th Cir. 2000) (*en banc*). Under the government's

19  reasoning, if Devore said that he would be going, it would have had suspicion. Similarly, if Devore said he

20  wouldn't be going, it still had adequate suspicion. In other words, "damned if you do, equally damned if you

21  don't." This is impermissible reasoning under *Montero-Camargo*.

22  Second, the government's contention that Devore may have been lying to Hamer is absurd.

23  For a year, Devore had regularly met with Hamer and confided with him about his sexual indiscretions.

24  Hamer apparently believed all of that information. Why would Devore lie about attending the convention,

25  ———————

26  [12]    Admittedly, the law review articles previously cited by Mr. Mayer do articulate a reasonable suspicion requirement. The government, however, does not rely upon them. The articles appear to be more

27  focused on government infiltrations of protected organizations when national security is at stake. Perhaps in such cases, a lesser reasonable suspicion standard would be appropriate. This, however, is clearly not such

28  a case.

1  a much less incriminating subject?  Moreover, Hamer told Devore that he was going to the convention.  By

2  lying and saying that he was not going, what was Devore hoping to accomplish?  Is the government claiming

3  that Devore was lying to Hamer with the hope that Hamer would cancel his trip so that Devore could then go

4  to the convention without Hamer being there.  This makes no sense.  It is simply another example of the

5  government's conduct in this case, i.e., saying whatever is convenient at the time without really thinking about

6  its basis in reality.

7           Third, the government claims that Hamer could only know for sure that Devore was not going

8  to attend the convention by actually going himself and confirming that he was not there.  This part of the

9  explanation may be even more absurd, if that is possible.  The FBI knew where to find Devore, who lived and

10  worked in southern California.  It would have been much easier for southern California agents, such as Hamer

11  and Caruthers, to simply conduct surveillance on Devore to check whether he was attending the convention

12  than flying all the way to Miami to ascertain that he was not going to show up there.

13           It does not matter whether the standard is reasonable suspicion or probable cause.  There was

14  proof beyond a reasonable doubt that Devore would not attend the Miami convention.

15           **D. There Was No Other Adequate Cause**

16           The government "acknowledges that the search warrant affidavits in this case alleged that at

17  the time of the 2004 convention, 'no specific targets had been identified.'"  GSR at 25.  Nevertheless, rather

18  than pointing to some particularized suspicion, the government makes a generalized claim that Hamer had

19  adequate suspicion.  The government claims that this suspicion is based on the fact that he sent Christmas

20  cards to prisoners and, at the previous year's conference, another individual stated that he sat at his computer

21  in his boxer shorts and got aroused when he chatted with a boy on the internet.  GSR at 26.  This does not cut

22  it.

23           Finally, the government repeatedly claims that Hamer had conversations with Mr. Mayer "the

24  night before the Miami conference began . . . ."  GSR at 26.  The only possible conversations that Hamer

25  could have had with Mr. Mayer were on the night of Friday, November 12, 2004.  The conference had already

26  begun at that point.  Hamer had already infiltrated the convention.  Indeed, that is how he gained his

27  introduction to Mayer.

28

# III.

## THE INVESTIGATION WAS NOT CONDUCTED IN GOOD FAITH.

The government criticizes Mr. Mayer's reliance on *United States v. Leon*, 468 U.S. 897, 923 (1984) in assessing the "good faith" requirement. *See* GSR at 21. The government points out, as recognized by Mr. Mayer, that the Ninth Circuit's discussion of "good faith" stated: "i.e., not for the purpose of abridging first amendment freedoms." *United States v. Aguilar*, 883 F.2d 662, 705 (9th Cir. 1989). The government, however, fails to address the cases cited in *Aguilar*, which demonstrate that Mr. Mayer's interpretation of the "good faith" standard is correct.

First, Mr. Mayer has contended that Hamer's instigation of criminal activity constituted a lack of good faith. In *Aguilar*, 883 F.2d at 705, the Ninth Circuit cited *Branzburg v. Hayes*, 408 U.S. 665 (1972) in articulating its good faith standard. In *Branzburg*, the Supreme Court discussed a lack of good faith in terms of "disrupting" a reporter's relationship with his source. *Id.* at 707. Here, by instigating criminal activity, Hamer was disrupting the policy and purpose of NAMBLA. Thus, the investigation was not conducted in good faith.

Secondly, based on *Leon*, Mr. Mayer has contended that a lack of good faith is shown if the government knew or reasonably should have known that it did not have sufficient cause to infiltrate. This contention corresponds with *Aguilar*'s description of investigations that are conducted "improperly." *Aguilar*, 883 F.2d at 705 (citing *United States v. Gering*, 716 F.2d 615, 620 (9th Cir. 1983)). An investigation is conducted "improperly" or without "good faith" when the government knows or reasonably should know that it does not have adequate suspicion.

In any event, the investigation in this case was for the purpose of abridging First Amendment freedoms. For approximately twenty years, the FBI has attempted to take down NAMBLA. It continued to do so even after a Senate subcommittee found that the organization is not engaged in criminal activity. The investigation in this case was not conducted in good faith.

05CR0343

## IV.

## DISMISSAL IS THE APPROPRIATE AND REQUIRED REMEDY.

Rather than addressing the authority cited by Mr. Mayer, the government prefers to claim that he has offered none. *See* GSR at 27.  Although this is getting repetitive, Mr. Mayer feels obliged to once again reiterate the authority that he has previously cited.

The first line of authority relied upon by Mr. Mayer is the Supreme Court precedent addressing First Amendment violations in the overbreadth context. *See, e.g., Broadrick v. Oklahoma*, 413 U.S. 601, 611-12 (1973).  The remedy for overbreadth violations is drastic; it is dismissal of the indictment.  Dismissal is the remedy even if the defendant's First Amendment rights are not violated.  In other words, a defendant can obtain a dismissal by raising the potential First Amendment rights of a third party in a hypothetical case.  In short, given its special status, the Supreme Court has made it clear that dismissal is the remedy for First Amendment violations.  The government has no response.

The second line of cases relied upon by Mr. Mayer is the supervisory power cases.  These cases hold that a court can dismiss an indictment under its supervisory powers for three reasons: (1) to remedy a constitutional or statutory violation; (2) to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct. *See, e.g., United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991).  As explained previously, all three reasons are particularly applicable in this case.  The government has no response.

Finally, the government claims that the charges in this case have nothing to do with the defendants' NAMBLA membership.  GSR at 28.  Not only is this besides the point under the overbreadth and supervisory powers rationale, it is simply wrong.  If Mr. Mayer had not been a NAMBLA member, he would not be before the Court.  There was no investigation of Mr. Mayer before Hamer's infiltration of the 2004 convention.  Indeed, the FBI did not even know who he was.  Even after conducting post-arrest search warrants on his home, the government has still found nothing illegal.  There is no evidence that Mr. Mayer was doing anything illegal at the time of the convention or that he had any specific plan of doing anything illegal in the immediate future.  The only reason why he stands before the Court is because he exercised his First Amendment right to attend a NAMBLA convention, and the FBI was interested in infiltrating that convention in order to instigate NAMBLA members into committing crimes.

1

## CONCLUSION

2     For the foregoing reasons, Mr. Mayer respectfully requests that the Court dismiss the

3    indictment.

4                                            Respectfully submitted,

5

6    Dated:    October 7, 2005              BENJAMIN L. COLEMAN
                                            Attorney for Mr. Mayer
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Search:   Lycos   Angelfire   Star Wars      Share This Page   Report Abuse   Build a Site   Browse Sites

Go Get It!                                    « Previous | Top 100 | Next »

# North American Man/Boy Love Association



On December 17, 1994., I was watching America's Most Wanted, when they aired a story concerning an organization called North American Man/Boy Love Association or NAMBLA. John Walsh stated "That he and the FBI has tried for years to stop NAMBLA, and that all members of NAMBLA are sexually abusing young boys." Stephen Davis Lewis was wanted for child sexual abuse and Leyland Stevenson who has been in prison for child pornography, said in his interview, that he and all the members have sex with young boys; they go to the park, library, and such, to pick up young boys for sex and there is nothing wrong with it."

I called NAMBLA's phone number in New York City and a recorded message said "If you want information about NAMBLA send a stamped self addressed envelope to PO Box 174, NY, NY 10018." I sent the request and received a pamphlet concerning NAMBLA and a membership form. In order to stop NAMBLA we needed to gather information on them. I sent a $25.00 American Express money order and became a member using an alias.

NAMBLA was featured on America's Most Wanted again, this time they arrested Stephen Davis Lewis, he was with a 15 year old boy.

I received my membership package. It contained a NAMBLA Bulletin with hand drawings of young nude boys, and stories of men sexually abusing young boys. It also contained a list of reading material anyone can order by sending a check payable to Zymurgy Inc." I called the New York Secretary of State to check on Zymurgy Inc., and was told they were incorporated on October 9, 1994., as a Type B Non Profit Corporation. Which means it was incorporated to "foster and advance greater knowledge and understanding of human sexuality through workshops and lectures. A Type B corporation in New York is the same as an IRS 501(c)3. This means that Zymurgy Inc., is granted special privileges including discounted postal rates, sales tax exemption, and the right to solicit tax-deductible contributions. To sum it up, we (the taxpayers) also provide support to the people who sexually abuse our children. I ordered a copy of the Articles of Incorporation on Zymurgy Inc., for a list of directors and other information. I requested an American Express copy of the negotiated $25.00 money order and received the copy with NAMBLA's bank account information (Apple Bank for Savings in New York City). I sent a request for the reading material with an American Express money order, in the amount of $6.50, payable to Zymurgy Inc.

Upon reviewing the Articles of Incorporation it stated that the three directors were; Peter Melzer, an New York Teacher; Robert J Rhodes, an Veteran Administration clerk; and William Andriette, the editor of the NAMBLA Bulletin. All three are verified NAMBLA members, Melzer was suspended because of his membership. With this information I sent a letter to The New York State Department of Education (copy attached), with copies to: the Attorney General, Dennis C Vacco; the Governor, George E Pataki; and the Secretary of State, Alexandra Treadwell. After five weeks of numerous calls, there was no response. On May 30, 1995., I called again and left a message that if I didn't receive a call by the 31st, I would contact the media. On May 31st, I called Mike Gallagher, a reporter with the New York Post and gave him the information. On June 1st, the story appeared in the paper and I received a faxed

MAY NOT BE USED OR PUBLISHED · PROPERTY OF U.S. GOVERNMENT

# EXHIBIT B

The reports outraged the public. Declaring that Sicari and Jaynes "should not see the light again," Governor Paul Cellucci joined a campaign to reinstate the death penalty, falling one vote shy (80-80) when a Democratic legislator changed his mind at the 11th hour. Sicari was eventually convicted of first-degree murder, while Jaynes got second degree. Because Jaynes had copies of the NAMBLA *Bulletin* in his car, NAMBLA quickly became a focus of the story. Sensing yet another PR disaster, the group issued this statement: "The alleged actions of these two individuals run absolutely contrary to everything we believe in and stand for. NAMBLA condemns the use of threat or violence against anyone."

That did not appease the Curley family, which has filed a $200 million civil suit against NAMBLA — specifically, purported members Roy Radow, Joe Power, David Thorstad, David Miller, Peter Herman, Max Hunter, Bill Andriette, Denny Mintun, and Arnold Schoen, most of whom were singled out because they were listed in the NAMBLA *Bulletin* as part of its publishing collective.

The suit claims that, "As a direct and proximate result of the urging, advocacy, conspiring, and promoting of pedophile activity by . . . NAMBLA . . . Charles Jaynes became obsessed with having sex with and raping young children."

Curley family attorney Larry Frisoli flatly compares NAMBLA to the Mafia. "NAMBLA is a criminal organization that teaches its members how to rape kids," he says in a conversation in his Cambridge office. "To say that age-of-consent should be changed is fine; it's legal. But to actually encourage and assist in the abuse of children is illegal. If you look at The Godfather, in the '40s and '50s the Corleones always got up there and said, 'We don't exist.' Yet they did exist. And NAMBLA does exist. And it has tiers of membership. And like the Mafia, the question becomes how much can you blame the Godfather for what the foot soldier on the street is doing?"

Many question the extent to which NAMBLA can be called a criminal organization, let alone one that resembles the Mafia. The FBI and several law enforcement agencies have been trying for years to find NAMBLA in violation of laws against the sexual exploitation of children. The most organized attempt, which included a year of police infiltration in the mid-1980s, produced nothing, and the U.S. Senate Permanent Subcommittee on Investigations found that NAMBLA did not engage in criminal activity.

The Massachusetts chapter of the American Civil Liberties Union, which is defending NAMBLA, agrees. "The lawsuit is akin to someone getting killed by the permissive attitude of sex, drugs, and rock 'n' roll, and then suing *Rolling Stone* for creating a climate when the murder was possible," says John Reinstein, the lead ACLU attorney on the case. "NAMBLA is not the Mafia."

On a bright, sunny Sunday afternoon in San Francisco, NAMBLA the Clown sits on the stage at the Folsom Street Fair, a popular and eclectic yearly gathering of leather daddies, bondage lovers, drag queens, ravers, and curious gay suburbanites. NAMBLA the Clown looks exactly like he said he would: Hell Raiser after a messy shopping spree at the Home Depot. He wears a heavy black robe, eight-inch

MAY BE REPRODUCED. PROPERTY OF THE U.S. GOVERNMENT.

LA0-00172

# EXHIBIT C

unfair behavior and defamatory anti-gay attacks of Alan Keyes," providing contact information for the producers of the show.

This despite the fact that report after report issued over the last several weeks have made it abundantly clear--the overwhelming majority of accused priests were homosexual priests, and many of their victims were teenage boys. Keyes was only stating what has become plainly obvious to many. The solution to the victimization of teenage boys by homosexual priests is NOT to promote more homosexual activity, but to STOP it!

In recent weeks it has also been reported that one of the accused priests participated in meetings of NAMBLA (North American Man-Boy Love Association), a group that openly promotes sexual relations between adult males and young boys. The accusations against Paul Shanley confirm Keyes' judgment that homosexual advocacy groups fuel sexual abuse.

And it is precisely this conviction which has led the Thomas More Law Center to represent parents of a child sexually abused and murdered by a NAMBLA member.

The goal of our lawsuit is to bring down NAMBLA by exposing it for what it is-an organized effort to hide criminal activity between predatory men and adolescent males.

And guess who is opposing us? The ACLU! They believe that NAMBLA has a constitutional right to advocate, encourage, and assist men in having sex with underage boys, and they refuse to acknowledge NAMBLA's role in facilitating predatory activity!

Father Richard Welch, CSSR, JCD, President of Human Life International, the world's largest pro-life, pro-family

apostolate noted, "The lawsuit against NAMBLA sees beyond the rhetoric and rationalizations of a society that is too cowardly to confront its own demons. Finally, we are asserting legally what we have always known in our hearts-that advocacy groups like NAMBLA serve to reaffirm and encourage deviancy, violence, and the exploitation of children."

Groups like NAMBLA and those that encourage homosexual activity MUST be stopped! Their influence on children, particularly in public schools, and in the Catholic Church, must end. Keyes' show last Tuesday is proof that these groups do not see themselves as part of the problem, but instead are seeking to take advantage of the current crisis in the Church to promote their own perverse agenda.

It is time to take action.

Show your support for Thomas More Law Center board member Alan Keyes and the courage of MSNBC in calling attention to the homosexual factor in the current Church crisis.

Contact Steve Lewis, Executive Producer

201-583-5000

E-Mail: steve.lewis@msnbc.com

SUPPORT the Thomas More Law Center and its fight against NAMBLA. The TMLC provides its legal services without charge to carry out its mission to protect and defend family values.

Click here to donate online or to find out how to help:

http://www.thomasmore.org/index.cfm?
location=9&subsectionid=2

Thank you, and may God Bless you.

Richard Thompson,

Chief Counsel

PLEASE FORWARD THIS MESSAGE TO YOUR
FAMILY AND FRIENDS

===============================================================

The Thomas More Law Center is a national, not for profit, public-interest law firm and educational
organization dedicated to the defense and promotion of the religious freedom of Christians, time-
honored family values, and the sanctity of human life. Its legal services are provided free of charge.

For information on supporting the Thomas More Law Center click the link below:
http://www.thomasmore.org/index.cfm?location=9&subsectionid=2

Visit our website at http://www.thomasmore.org

**TOPICS:** Extended News; News/Current Events
**KEYWORDS:** ALANKEYES; CATHOLICLIST; GAYLOBBY; GLAAD; HOMOSEXUAL; KEYES;
MILITANTHOMOSEXUALS; NAMBLA; SASU

**Navigation:** use the links below to view more comments.
first 1-50, 51-72 next last

## MSNBC'S 'ALAN KEYES' MISTREATS GUESTS, DEFAMES GAY CATHOLICS

# EXHIBIT D

RMH:rmh

1

      For the information of the file, SA          in his undercover capacity is a member of NAMBLA (North American Man Boy Love Association).  On 12/12/2001, SA     received from Peter Herman, PO Box 174, Midtown Station, New York, NY 10018 mailing labels for the following imprisoned individuals.  NAMBLA members have been asked to mail Christmas cards to these individuals.  (AUSA Patti Donahue stated that due to the fact all of the prisoners are sentenced there is no prohibition in communicating with the prisoners.)

     William C. Enright

     George H. Evans III

     Dean Ferguson

     Shane L. Ferrante II

     Mike Ferris

     Robert W. Figures Jr

     Jim Fitch

     John A. Floyd

WILL NOT REPRODUCE. NOT PROPERLY REPRODUCED. GOVERNMENT. REPRODUCED U.S.

2

Gary Ford

David J. Fritz

John D. Gay

Jake George

Richard Gill

Susan Green

Richard Gomez

A copy of this letter and a copy of the mailing labels have been made a part of the 1-A section of this file.

MAY NOT BE PROPERTY GOVERNMENT REPRODUCED. OF U.S.

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription _____ 02

On 12/2/2002, SA _____ while acting in undercover capacity received a letter from Peter Herm___ 341 Lafayette St., #175, New York, N___ 10012. Herma___ is a member of NAMBLA. Herman provided the following 27 name of incarcerated NAMBLA members and associates. ___rma___ ___ ___ed that Hamer send each of these individuals a ___o___da___ ___d.

Wilbert V. Abril

Steven Adams

Karl Ahlers

Barry Alber

David C. ___

Charles Ande___on

Eric Nell Ange___e

John Archer

MAY NOT BE PROPERTY BE REPRODUCED GOVERNMENT OF U.S.

COPY

LA0-00070

Investigation on __12/2/2002__ at __Los Angeles, CA__

File # _____     Date dictated __12/2/2002__

by __SA__

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ , On 12/2/2002 , 2

Curtis Arnold

Michel G. Arsenault

Paul Atkin

Alan Bagration

James R. Bailey

Jason ____in

Keith Baker

Paul Barley

Rob___ Barrett

MAY NOT BE PROPERTY OF U.S. GOVERNMENT REPRODUCED

LA0-00071

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ , On 12/2/2002 , Page 3

Chuck Bathel

Jimy Belisle

Gerald Bending

Christopher T. Berch__

Bernie Beyer

Richard ___

Jeffery Black__on

Mikel Ma___l1

Bob Mart___

Ale__nder Martinelli

MAY NOT BE REPRODUCED. PROPERTY OF U.S. GOVERNMENT

LA0-00072

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription ___12/__/2003___

    SA       while acting in an undercover capacity
received the following names as inmates who were participating in
the NAMBLA Christmas card project.

Charles Tasey


Scott W. Taylor _____


JW Taylor _____


William M. Taylor _____


Michael _____


William _____


James A. Thomas _____


L. Thompson _____

MAY NOT BE PROPERLY REPRODUCED U.S. PROPERTY OF GOVERNMENT

LA0-00050

Investigation on ___12/12/2003___ at ·Los Angeles, CA

File # _____         Date dictated ___12/12/2003___

by _____

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___NAMBLA  CHRISTMAS  CARDS___ , On 12/12/2003 Page ___2

Hugh Thompson

Robert Paul Thornburgh

Ronald Thornton

Hector Torres

Dan Tower

Richard Trevino

Robert Tucker

Robert S. Turner

David B. Tyler

Fred Van Ackeren

Jim Van Hooser

MAY NOT PROPER BE GOVERTY REPRODUCED OF US.

LA0-00051

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___NAMBLA CHRISTMAS CARDS_____ , On _12/12/2003_ , Page ___3___

Juan L. Vielman

William M. Vogt

Christopher Wagner

Tom Wagner AT

Troy Alan Wagner

Thomas Walden

Robert Waldman

Harry J. Walker

David Wells

Robert Kim Walton

MAY NOT PROPERTY BE GOVERNMENT REPRODUCED OF U.S.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___NAMBLA CHRISTMAS CARDS_____ , On _12/12/2003_ Page __4__

Dana Waters

Dayle L. Wheelock

Sean Whitman

William Widener

Neil E. Wilkinson

Kim Wilson

Hartwell Wilson

Michael Wilson

Barry Zion

Larry Wisenbaker

MAY NOT BE PROPERTY OF U.S. GOVERNMENT REPRODUCED.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of     NAMBLA CHRISTMAS CARDS                ,On 12/12/2003  Page  5

Otis Odell Wood

Glenn Wright

Doug Young

Wilbert V. Abn__

Steven Adams

Karl A__lers

David C  Allen

Charles Anders__

David A__ge_

E__c__ei_ Angevine

Curtis Arnold

MAY NOT BE PROPERTY OF U.S. GOVERNMENT REPRODUCED

LA0-00054

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of     NAMBLA CHRISTMAS CARDS _____     On 12/12/200_   Page   6

Michel G. Arsenault

inmates he received for th_ NAM_LA _roject. Th_y are:
the list of

Troy Naylor,

Clyde Nettles

Jeffrey Ni__el

Winfred O_i_er

James P_rrish

William Paul

Nic__las A_bert Pracht

Alfred N. Rea

LAO-00055

MAY NOT PROPERLY BE GOVERNMENT REPRODUCED. PROPERTY OF U.S.

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____NAMBLA CHRISTMAS CARDS_____ , On 12/12/200_ , Page ___7___

William Riley

Reno Neely

Emanuel Newman

James Noyer Sr

Ray Opfer

Michael Parsons

Dwane D Peterson

Timothy W. Prince

Robert R. Reinhart

Ronald Riel

MAY NOT BE PROPERTY OF U.S. GOVERNMENT REPRODUCED.

LA0-00056

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of     NAMBLA CHRISTMAS CARDS                    On 12/12/200_ , Page    8

Scott D. Ritchie

Mark N. Nielson

Mitchell Nicholas

David J. Oakes

Alfredo Sanier Palacio

Lance D. Pauly

Timothy L. Philmon

Joshua Quinones

Don Rafael S

Gary Don Riley

MAY NOT PROPERLY BE GOVERNED BY REPRODUCED OF U.S.

LA0-00057

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___NAMBLA CHRISTMAS CARDS___ , On 12/12/2003 , Page ___9___

John A. Rodda_____

MAY NOT BE PROPERTY OF U.S. GOVERNMENT REPRODUCED.

LA0-00058

# EXHIBIT E



# NAMbLA

# WHO WE ARE

**WELCOME!** The North American Man/Boy Love Association (NAMBLA) was formed in 1978. It was inspired by the success of a campaign based in Boston's gay community to defend against a local witch hunt.

NAMBLA's goal is to end the extreme oppression of men and boys in mutually consensual relationships by:

- building understanding and support for such relationships;
- educating the general public on the benevolent nature of man/boy love;
- cooperating with lesbian, gay, feminist, and other liberation movements;
- supporting the liberation of persons of all ages from sexual prejudice and oppression.

Our membership is open to everyone sympathetic to man/boy love and personal freedom.

NAMBLA calls for the empowerment of youth in all areas, not just the sexual. We support greater economic, political and social opportunities for young people and denounce the rampant ageism that segregates and isolates them in fear and mistrust. We believe sexual feelings are a positive life force. We support the rights of youth as well as adults to choose the partners with whom they wish to share and enjoy their bodies.

We condemn sexual abuse and all forms of coercion. Freely-chosen relationships differ from unwanted sexual assault. Laws which focus only on the age of the participants, ignore the quality of their relationships. We know that differences in age do not preclude mutually loving interaction between persons. NAMBLA is strongly opposed to age-of-consent laws and all other restrictions which deny men and boys the full enjoyment of their bodies and control over their own lives.

NAMBLA does not provide encouragement, referrals or assistance for people seeking sexual contacts. NAMBLA does not engage in any activities that violate the law, nor do we advocate that anyone else should do so.

We call for fundamental reform of the laws regarding relations between youths and adults. Today, many thousands of men and boys are unjustly ground into the dysfunctional criminal justice system. Blindly, this system condemns consensual, loving relationships between younger and older people. NAMBLA's Prisoner Program, with limited resources, works to provide a modicum of humanity to some of these people.

MAY NOT BE ACCURATELY REPRODUCED FROM CR-OMEN

LA0-00115

Click here to find out more.

**NAMBLA is a political, civil rights, and educational organization. We provide factual information and help educate society about the positive and beneficial nature of man/boy love.** Become an active member! You can help in this historic struggle!



Copyright © NAMBLA, 2003. All rights reserved.

MAY NOT BE PROPERTY OF U.S. GOVERNMENT REPRODUCED

LA0-00116



# The PRISON PROGRAM

Our prisoner program seeks to provide moral support to incarcerated boy-lovers. These people experience a harsh and exceptionally hostile environment which undermines their self-concepts and self-respect. We keep in touch with prisoners, primarily through a monthly Prisoners' Letter.

## The Prisoners' Letter

Our Prisoners' Letter includes excerpts from our Bulletin and our other publications. Those publications, which are legal reading material in the United States, have been rejected by many prison mail rooms as detrimental to the rehabilitation of the inmate.

(We maintain that we are the only organization helping inmates to understand and cope with their sexuality. Certainly the penal system is not in the rehabilitation business.)

The unstated reason for the rejection of our publications by some prisons is that they contain pictures. Although these are legal images, they seem to offend some of the mail room personnel. However, our Prisoners' Letters contain only text, so they are usually accepted. A former prisoner may continue to receive the Prisoners' Letter while on parole, or may switch to a regular membership and receive all of our publications by paying dues (or limited if the dues if unemployed).

Requests to receive the Prisoners' Letter must come from the individual himself. These requests should be sent to

Peter Herman, 341 Lafayette Street #1, New York, NY 10012

We welcome donations to cover the costs of printing and mailing to prisoners.

## Pen Pals                                                   LA0-00117

We encourage you to correspond with prisoners. Occasional friendly letters from friends and family can be a lifeline. Many ugly prison incidents can be prevented or mitigated by a prisoner's contacts with the outside world. Letters and visits can provide much-needed social and psychological support for inmates facing an arbitrary and often brutal prison system, who might otherwise lose touch with reality.

Prisoners' incoming and outgoing mail is opened for inspection, and usually only

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

checked for contraband. However, the mail is sometimes read. We urgently advise pen pals to avoid writing about any activities, whether real or imagined, that could be considered illegal. Correspondence could affect a prison's evaluation of a prisoner's state of mind, degree of "rehabilitation" and suitability for parole. We also advise that you should never become involved in any financial transactions with your pen pals.

## Resource Limitations

Because of the volunteer nature of our organization, we do not have the resources to become involved in individual cases, and so cannot offer financial support or legal counsel. Nor can we send free books or other publications to prisoners.

## Disparate Treatment

There is a "pecking order" throughout the criminal justice system, shown in everything from treatment at the hands of the police, through court proceedings, to treatment of prisoners and parolees by fellow inmates, guards, and parole officers. Violent criminals, even murderers and rapists, are given higher status in the prison populations than boy-lovers who were convicted of consensual relations with minors.

The convicted individuals near the top of this pecking order often receive lighter sentences and are routinely paroled at the earliest opportunity; sometimes they are even paroled early to make prison space available for those at the bottom of the pecking order. A convict at the bottom of the pecking order can expect to receive at least as long a sentence as a murderer, and may receive multiple, consecutive sentences. Even if concurrent multiple sentences are imposed, this can affect an inmate's parole chances. One conviction for each illegal sexual act is common.

Blindly, the criminal justice system fails to differentiate between individuals accused of coercive or violent sexual acts against youngsters and consensual, loving relationships between younger and older people. The Prisoner Program's intention is to support those unjustly imprisoned for the latter, and to raise the consciousness of those guilty of the former.

## Therapy

Some states conduct therapy programs for inmates, and for parolees once they are released. The therapy ranges from drug therapy and aversion therapy to group counseling. For parolees, usually the sentence inmate's "cooperation" with the prison therapists conducting the program is required. Prisoners are required to enroll for a "cure," to participate, and to seem to be rehabilitated. Some prisoners refuse therapy. These programs have never been shown to have any lasting value for the prisoner or for society.

Authorities are continuing to hold those they consider to be "sexual predators" even after completion of their original sentence and parole time. These people are kept behind bars under "civil commitment" laws even though they have not been shown to be dangerous or mentally ill. Other recent laws require the registration of ex-"offenders" with police agencies and community notification of a parolee's presence, assuring pariah status and inviting vigilante action.

MAY NOT BE REPRODUCED
PROPERLY AUTHENTICATED
GOVERNMENT

Many states are notorious for returning sex "offenders" to prison for trivial violations of parole conditions. Of course, this disrupts and prevents the parolee's adjustment and re-entry into ordinary society. Parole violations are a major contributor to widespread over-crowding of jails and prison facilities.

## Family and Friends of Prisoners

Incarceration is a terrible thing. For a boy-lover ground into the criminal justice system, it is an especially harrowing fate.

One of the factors that can add to a prisoner's despair is the loss of all social and family support. Society's confusion about the nature of man-boy love and stigmatization of this orientation often cause family members and friends to distance themselves from the incarcerated individual. The distant locations of prisons and their intimidating procedures also discourage visits and continuing support.

This does not have to be so. If you have a relative or friend incarcerated for non-violent acts and want to get a better understanding of the issues involved, please get in touch with us.

## Things You Can Do:

- Make a monetary contribution to the Prisoner Program. This will allow us to increase the number of newsletters we can send. Tell incarcerated boy-lovers you know about the Prisoner Program.
- Acquaint yourself with the dos and don'ts of writing to prisoners and become a pen pal.
- Visit an incarcerated boy-lover.
- Connect with the Prisoners' Civil Rights movement.
- If you have an incarcerated family member or friend and you need to better understand his situation, contact us.



Copyright © NAMBLA, 2004. All rights reserved.

MAY NOT BE REPRODUCED. PROPERTY OF U.S. GOVERNMENT

LA0-00119

# EXHIBIT F

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    1  /  /  03

SA                          while acting in an undercover capacity
attended the NAMBLA Conference in New York City from 11/ /2003.
attended the all day session on 11/8 and 11ft the 11/9 session at
approximately 11:25 am. The 11/9 session was scheduled to go throughout
the afternoon. On 11/8/2003 and 11/8/2003,          recorded the sessions.

The conference began on 1/7/200  when attendees were
instructed to meet at the dining concourse of Grand Central Station
between 5 pm and 6:30 pm. For security reason          did not wear a
recording device for the initial meeting. At that time, attendees were
given instructions as to the location of the meetings scheduled for
11/8 and 11/9. Those meetings took place at New York Spaces, 520 8th
Street, 16th floor. These American Press posted the conference and
attendees were to tell anyone who inquired that the meetings were for a
publishing seminar. Members were warned "to be discreet."

Peter Herman passed out the instructions for the meetings and
led each session. Numerous members were present on 11/7 to receive
instructions for the weekend meetings. All of the members were white
males. After the members arrived, they broke up into various non-formal
groups and went their separate ways.          went with a group that
toured Times Square. Members that identified themselves to     that
evening included Peter Herman, Ivan Rifkin,                  Jim
Cooper,                                     (                        ), Jr.
Jeff LNU (                                 ), Joe LNU from Ann Arbor, Mich, Ted
from New York, Floyd LNU from,             ,  Bruce Braverman
(                     ), Bruce LNU from,       , and Ian LNU from        .
The group that went to Times Square spent time in the Toys R Us store
watching boys on the Ferris Wheel. The group then walked to the Tick
Tock Restaurant on 34th Street.

At dinner,          sat with Jeff and Joe. Jeff is an ordained
minister from          and also works at a chiropractic college in
     .  He is divorced and has three adult children. He admitted to
having sex with a 16-year old in Balboa Park, San Diego, three years
ago.  He said that it is known that he is gay but he has not admitted
publicly to being a boy lover. He is still on staff at the church. He
is described as     ,     ,     ,     ,     hair, no facial hair, left ear
piece.     He stayed at the

UNREDACTED / NOT TO BE RELEASED

**LA0-00029**

Investigation on   11/7-9/2003   at  New York, NY

File #

Date dictated   11/10/2003

by   SA

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___NAMBLA_____ , On _11/7-9/2___ , ___2___

      Joe works as night lobby guard in _____ but his avocation is composing music. He is gay and has a "b____ lover." Both he and his lover are boy lovers. He has composed two symphonies and an opera that have been performed. He is described as late _____ early ____ ,

      During the course of the meetings others spoke with ____ .

      Peter Herman lives in the _____ and organized the conference. He is on the NAMBLA steering committee. Years ago he was exposed as being a NAMBLA member and was suspended from his teaching position in the _____ school system where he taught math and physics. He was suspended for 2 years with pay and allowed to retire. He was born in, _____ and moved to the US when he was 11. He was named in the Boston civil law suit. He is in his late ____ , approximately ____ , ____ pounds, _____ _____ .

      _____ is from the _____ and is the editor of the _____ . He is approximately ____ .

      David Miller is from the _____ and works on the ____ . He is late ____ early ____ .

      Floyd is from the _____ and helps with the ____ and the ____ . He is a ____ with ____ hair, ____ and has an arthritic hip causing him to limp.

      Jim Cooper lives in ____ near an all boys school. He takes photos of the boys. He was arrested in ____ but after three trials ending in hung juries, the charges were dropped. He was active in NAMBLA at that time and attended monthly meetings. He implied that there was a law enforcement sweep of the meetings that led to his arrest. Numerous photos were seized at the time but were returned. The boy he was charged with seducing testified that the psychiatrist coerced the boy's testimony. Cooper is a retired ____ (____ ____ ) and is now a ____ . Cooper said he was targeted because he was a NAMBLA member. He is in his late ____ approximately ____ hair (comb over).

      Bruce Braverman lives in ____ _____ . He works as a senior telephone ____ _____ . He is in his ____ , ____ collar

MAY NOT BE REPRODUCED. NEW IMPROVEMENT PREV REPRODUCED COPIES

LA0-00030

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ____NAMBLA_____, On 11/7-9/___  3

length hair. He attended the Saturday session for a ___ ours.
did not see him at the Sunday se___on.

    Rowan Rifkin lives i___ ___ ___ is in ___is late
approximately     . He i___ a ___etir___ ___.

    Bruce LNU is fro___ ___ Thi___ ___his first
conference and is a friend of Renato ___) a___ ctive member of NAMBLA.
Bruce wore a baseball ca___ ___ ___ id n___ ___e ___m at the Sunday
session.

    Bob Schwar___ ___ fro___ ___. He ___ in his , approximately
", ___ pound___ ___ ___. During the course of
the meeting he said that he ___ikes t___ ___t at his computer in his boxer
shorts, exposing h___sel___ and g___t a___ ___ if he knows he is chatting on
the Internet wi___ a ___y.

    Rob___ ___U is from ___. ___e is in his late___ ; early ___.
He is appro___ mat___ ___ . He previous___y worked as a ___ and
a young___ ___in___ ___. He is between
___ow.

    ___an LNU f___ ___ had a ___ and wore shorts and
short___leev___ shirts a___ e___ch of the sessions.

    Ch___is ___NU w___ a lo___g time NAMBLA member. He described himself
as a socialis___ ___ see___no ___o destroy the capitalist system. He had
hair and wore a baseball ___ap.

    ___d LNU ___ ___rom ___ He has been very active in NAMBLA
in th___ past in___ lu___ing representing them on the IGLA (International Gay
Lesbian Associa___ion). NAMBLA has been dismissed from the IGLA. On the
first eveni___ ___ ___e meeting he wore a plaid shirt. He is a retired
___ ___ (___ ___) and sponsors a
___ ___in the Philippines.

    To___ LNU is a dentist from Dallas. This was his second
confe___ce. ___e sang Happy Birthday to ___. Todd said he calls his
patient___ ___d sings to them as a PR gimmick that has attracted new
pat___ts.

    Bill LNU is from ___ where he manages his parents'
trailer park. This was his first conference. He has been a member for
several years. He has ___ hair, is in his and is
approximately

LA0-00031

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of    NAMBLA _____ , On 11/7-9/20__ , Page    4

Tomas LNU came from _____ .. He is

Peter Reed (ph) a.k.a. _____ is fro_ _____ . He was
a _____ and is in char_ of t_ _____ . He is
late_ early  , wears a hea_in_ a__ i_ his l_ft ear and wears

Tim Bloomquist_as descr_bed a_ _, _ hair,      . He
wore a Green Party t-shir_ _o th_ S_t__day se_s_on. He advocated taking
a more active public st_n_e. _He a_m__te_ to m__ching in parades as a
NAMBLA member years ag_. He_was_ _fo_mer me_bership chairman.

During mi_ _orn_n_ of _ _nday session Paul LNU arrived. He
was from _____ _bly. _ was_ _iend of Bloomquist, wore
_____ and a we_d_n_ ring.

It _a_ _o_ed that _this wa_ _e 25th Anniversary of NAMBLA.
Approximate__ 30 _embers attended. P_ter Herman said that there are 350
members. T_ _loomquis_ told _____ that in the mid to late 90s there
were over_120_ _embe_s b_t m__ _ropped their membership when the
Boston _iv_ s_i_ _as _i_e_.

___ _ should be_ _o_ed t_at this 302 is not meant to be all
inclus_v_ _ as the ses_ions _ere recorded. Also descriptions were
provided __ _de_ti_y _hos_ __ the video. Several times members noted
that they us_ _al_ases, t_e_efore it is unknown if the members who
introduced_them_e_ve_ _e__ using their true names. Attendees were
warned t_ _e caut_o__ e_en in discussing matters with other attendees
because_the_group_had_ _een infiltrated in the past with law
enforcem_nt._

MAY NOT BE REPRODUCED IN OPEN COURT GOVERNMENT

LA0-00032

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   11/21/2003

On November 19, 2003, Ann Cheung, Compliance Paralegal for Yahoo!, telephone number (408) 349-36  , facsimile number (408) 349-7941, sent by facsimile a response to the administrative Subpoena submitted for information on a list of names.

The following information was obtained from Yahoo!:

* e-mail address:
* alternate e-mail address:
* Other Identities:

* IP address:
* City/State:
* Country:  United States
* Zip/postal code:
* Date created:  Tuesday July 7 22:04:16 1998
* account status:  active
* New Password Requested:  Wed Nov 14 22:04:14 2001
                            24.0.215.23 (;pw;)
                            Sun Sep 2 08:12:42 2001
                            24.0.215.23
  Chat Agreed (chat_agreed):  Wed Jul 8 18:38:02 1998
  Yahoo Mail Agreed (ym_agreed):  Wed Jun 23 09:26:40
                            1999
* IP Login Tracker:

  Yahoo Mail Name:
* Registration IP address:
  Full Name:  Mr. Rowan Rifkin
  Address:

* City/State:
  Zip code:
* Country:  United States
  Phone:
* Account created:  Mon Sep 14 22:19:10 1998
* My Yahoo Configured:  Mon Sep 14 22:19:11 1998

MAY NOT BE REPRODUCED. NO REPRODUCTIONS

LA0-00033

| Investigation on | 11/21/2003 | at | Los Angeles, California |

File # _____     Date dictated _____

by   SA Tia A. Hoffer

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ , On 11/21/2003 , Page   2

       \*   Account Status:   Active

     The response to the Administrative Subpoena from Yahoo is attached and made a part of this FD-302.

MAY NOT BE REPRODUCED — PROPERTY OF U.S. GOVERNMENT

LA0-00034

(Rev. 01-31-2003)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                    **Date:** 04/12/20~~~

**To:** Dallas                    **Attn:** SSA Steven Lester
                                         CYBER/CAC

**From:** Los Angeles
          CY-4
          **Contact:** SA Tia A. Hoffer, (3~~) ~~6-3971

**Approved By:** Denny Richard W~~~

**Drafted By:** Hoffer Tia A:~~~~~

**Case ID #:**  __         (Pending) ~~~

**Title:**
        UNSUBs;
        ITOM - SEOC;
        OO:LOS ANG~~~~~

**Synopsis:** To inform Dallas Division regarding information
about potential subjects in the Dallas, Texas area.

**Enclosure(s):** One (1) copy of an FD 302 report of the
consensual monitored meeting with UCE and potential subjects.

**Details:** In August 2003, FBI-Los Angeles learned that registered
sexual offenders, including,              planned to attend the NAMBLA
convention held in New York City, New York in November, 2003.  A UCE
in Los Angeles was invited to attend the NAMBLA convention.  During
the course of an undercover investigation the following subject
engaged in conversations with undercover employee (UCE):

        1)  Name:         Todd Last Name Unknown (LNU)
            work:         Dentist

        The UCE attempted to gather further intelligence
regarding potential subjects.  No further information was
obtained regarding the activities of the above mentioned
individuals. The information contained in this electronic
communication is for your information and your discretion.

MAY NOT BE PROPERLY GOVERNED UNDER FILTER DIVISION — STILL BE PRODUCED

LA0-00045

To:   Dallas   From:   Los Angeles
Re:                    04/12/2004

**LEAD(s):**

**Set Lead 1:   (Discretionary)**

    <u>DALLAS, TEXAS</u>

      <u>AT DALLAS</u>

        To disseminate information regarding potential
subject in the Dallas area: Todd LN.

♦♦

MAY NOT BE PROPERTY OF U.S. GOVERNMENT REPRODUCED

LA0-00046

(Rev. 01-31-2003)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                         **Date:** 04/12/2004

**To:** Newark                      **Attn:** SSA Timothy Nester
                                                CAC/Innocent Image

**From:** Los Angeles
          CY-4
          **Contact:** SA Tia A. Hoffer (310) 996-3971

**Approved By:** Denny Richard W

**Drafted By:** Hoffer Tia A

**Case ID #:** (Pending)

**Title:**
          UNSUBs;
          ITOM - SEOC
          OO:LOS ANGELES

**Synopsis:** To inform Newark Division regarding information
about potential subjects in the New Jersey area.

**Enclosure(s):** One (1) copy of an FD-302 report of the
consensual monitored meetings with UCE and potential subjects,
one (1) copy of the results of a Yahoo! administrative
subpoena.

**Details:** In August, 2003 FBI Los Angeles learned that registered
sexual offenders, including                    planned to attend the NAMBLA
convention held in New York City, New York in November, 2003.  A UCE
in Los Angeles was invited to attend the NAMBLA convention.  During
the course of an undercover investigation the following subjects
engaged in conversations with undercover employee (UCE):

          1)  Name - Jim Cooper
              e-mail address -
              height -
              weight -
              hair color -
              potential occupation -

          2)  Name - Rowan Rifkin
              e-mail address -
              height -
              weight -

MAY NOT PROPERLY BE REPRODUCED NEVER BEEN PRODUCED

LA0-00026

To: Newark  From:  Los Angeles
Re:                04/12/2004

3) Tim Bloomquist
   height -
   hair color -
   accessories -

4) Ted Last Name Unknown (LNU)
   Misc.: represented NAMBLA on the International
   Gay Lesbian Association (ILGA)

5) Paul LNU
   Early
   Misc,:         wedding ring, friend of
   Bloomquist

    The UCE attempted to gather further intelligence
regarding potential subjects.  No further information was
obtained regarding the activities of the above mentioned
individuals.  The information contained in this electronic
communication is for your information only.

MAY NOT BE COVERED BY REPRODUCED OF U.S. GOVERNMENT

2

LA0-00027

To:  Newark   From:  Los Angeles
Re:                  04/12/2004

**LEAD(s):**

**Set Lead 1:   (Discretionary)**

    <u>NEWARK</u>

       <u>AT NEW JERSEY</u>

         To disseminate information regarding potential
subjects in the New Jersey area, Jim Comer, Rowan Rifkin, Tim
Bloomquist, Ted LNU, Paul LNU.

◆◆

MAY NOT PROPERTY BE REPRODUCED GOVERNMENT OF U.S.

3

LA0-00028

# EXHIBIT G

## AFFIDAVIT

I, Sharron M. Cannella, being duly sworn, do hereby depose and state:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and I have been so employed for seven months.   Prior to my career as a Special Agent, I was employed for four years as a police officer in Pennsylvania.   As a police officer, I  conducted investigations which led to numerous prosecutions.   In addition, I worked with a Drug Task Force, primarily in an  undercover capacity.   In addition, I have two years experience as a correction officer.   I have a Bachelors Degree in Political Science and a minor in Criminology.   I am currently on rotational assignment on a multi-agency child exploitation task force known as the Southern California Regional Sexual Assault Felony Enforcement Team ("SAFE Team").   My responsibilities include the enforcement of federal criminal statutes involving the sexual exploitation of children pursuant to Title 18, United States Code, Section 2252, et seq., in the Central District of California.   I further am responsible for investigations involving the possession, distribution, reproduction and production of child pornography.   During my tenure as a Special Agent with the FBI, I have conducted and participated in investigations of criminal activity, including the investigation of child exploitation offenses involving

MAY BE PROPERTY OF BUREAU OF REPRODUCED

computers.  During the investigation of these cases, I have
participated in the execution of search warrants, and seized
evidence of such violations of federal law.

2.  The information contained in this affidavit is based on
information related to me by other agents, and my personal
observations and experience.  In particular, I have spoken to and
consulted with SA Adrienne N. Mitchell and SA Gina A. Hoffer, who
are both assigned to the SAFE Team, and who are not familiar
with the investigation described below.  This affidavit is
intended to show that there is sufficient probable cause for the
requested complaint, arrest warrant and search warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.

3.  SA Mitchell has been employed by the FBI for two and one
half years.  Prior to that, she was a probation officer in the
state of Indiana for seven years.  During her tenure as an SA
with the FBI, SA Mitchell has conducted and participated in
investigations of criminal activity, including the investigation
of child exploitation offenses involving computers.  During the
investigation of these cases, she has participated in the
execution of numerous search warrants, and seized evidence of
such violations.  She has received more than 120 hours of
training for investigation of online child exploitation through
the FBI and private vendors.  She also has received 32 hours of
introductory training in computer forensics.

MAY NOT BE PROPERLY REPRODUCED.  NEW VIRUS.

LA0-00002

2

4. SA Hoffer has been employed by the FBI for more than six years. Prior to her work at the FBI, she obtained her doctoral degree in Clinical Psychology and worked for more than seven years as a psychologist in the State of California. During her tenure with the FBI, she has participated in Crimes Against Children cases, including the sexual exploitation of children and child pornography via the computer. During the investigation of these cases, she has participated in the execution of dozens of search warrants, and seized evidence of such violations. She has provided training in Internet-facilitated child exploitation investigations to law enforcement officers, prosecutors, parents and mental health providers. SA Hoffer is currently the National Center for the Analysis of Violent Crime (NCAVC) Program Coordinator for the FBI Los Angeles Field Office.

## II. PURPOSE OF AFFIDAVIT

### A. Complaint and Arrest Warrant

5. I make this affidavit in support of a complaint against, and arrest warrant for, JEFFREY WOLDEN DEVORE for violations of 18 U.S.C. § 2252A(a)(2): knowing distribution of child pornography that has been mailed or shipped or transported in interstate commerce by any means, including by computer.

### B. Search Warrant

This affidavit is also being submitted in support of a warrant to search for and seize evidence of violations of 18 U.S.C. §§ 2252A(a)(1): knowing interstate transportation of child

3

pornography; 2252A(a)(2): knowing receipt or distribution of child pornography that has been mailed, or shipped or transported in interstate commerce by any means, including by computer; 2252A(a)(3): knowing reproduction of child pornography for interstate or foreign distribution; 2252A(a)(5)(B): knowing possession of child pornography that has been mailed, or shipped or transported in interstate commerce by any means, including by computer; and 2422(b): using a facility of interstate or foreign commerce to knowingly persuade, induce, entice or coerce a minor to engage in sexual activity for which any person can be charged with a criminal offense, located at

("the Subject Premises"), which is believed to be DEVORE's residence.

7. The Subject Premises is more particularly described as follows:                    is an apartment contained within a four-unit apartment complex with units with a cream/tan stucco exterior and a brown shingled roof.  The building number " " on the building appears metallic.  The apartment is a one-story structure located on the northwest corner of

     and .      The front portion of the apartment is facing and parallel to North           while the side and rear of the apartment are on              .  The main entrance door is wooden with diamond shaped yellow, red, green and blue stained glass portions.  The main entrance wall facing North

has brick covering from the foundation up to approximately

LA0-00004

MAY CONTAIN INFORMATION NOT PROPERLY REFLECTIVE OF US. GOVERNMENT LEVY REPRODUCED

half way where the brick meets two main windows and wooden

siding.  The building number    is posted on the right-hand

side of the main entry door.  The apartment's specific letter and

number, ":    ," is located on the side of the building in

in black numbering and attached to a silver wood siding

panel above the complex's brass covered mail boxes on

## III.  BACKGROUND REGARDING CHILD PORNOGRAPHY AND COMPUTERS

8.  The following terms have the indicated meaning in this

affidavit:

a.  The term "minor," "sexually explicit conduct,"

"child pornography," "visual depiction," and "producing," as used

herein, are defined as set forth in 18 U.S.C. § 2256.

b.  An Internet Service Provider ("ISP") is a company

that provides dial-up or some other type of access to the

Internet for a monthly fee.  Examples of such companies are SBC

Internet Services, America Online, Inc., Adelphia, and AT&T

Broadband.

c.  The process of transmitting a file from one

computer to another computer is called "uploading."

d.  The process of receiving a file from another

computer is called "downloading."

e.  Yahoo! Inc. ("Yahoo!") is a commercial computer

service company that provides services to Internet users that

include e-mail, Groups, Internet search capability, games,

personal ads, chat, instant messaging, personal profiles, and

5

MAY NOT PROPERLY REPRODUCE DOCUMENT IS AN INFERIOR REPRODUCED.

other services.  Many of the services offered by Yahoo! are free to the user.

## IV.  INVESTIGATION

9.  On February 7, 2005, I spoke with SA Mitchell and S Hoffer and reviewed documents and reports regarding this investigation.  Based on my conversations and review of the documents, I learned that in November 2003, an FBI Undercover Employee (UCE) attended a convention held by the North American Man Boy Love Association (NAMBLA) in New York City, New York, in order to conduct an investigation into the activities of a NAMBLA member.  According to the NAMBLA website, www.NAMBLA.org, their "goal is to end the extreme oppression of men and boys in mutually consensual relationships" and "calls for the empowerment of youth in all areas, not just the sexual."  During the course of attendance at the convention and other activities with attendees, the UCE met Jeff Last Name Unknown (LNU), later identified as DEVORE.  DEVORE disclosed to the UCE that three years ago he had sexual contact with a sixteen year-old boy in Balboa Park, San Diego, California.  DEVORE also disclosed to the UCE that he was currently communicating on the Internet with a fourteen year-old male from Canada.  DEVORE told the UCE that he is divorced, has three adult children and lives in Orange County, California.  DEVORE also told the UCE that he was a minister, and a chiropractor at a chiropractic school in          , California. DEVORE gave the UCE the following e-mail address to contact him:

MAY NOT BE REPRODUCED — PROPERTY OF THE GOVERNMENT

LA0-00006

10.   On November 10, 2003, the UCE sent an e-mail to
_____, stating that it was great to meet him the
past weekend and that he had to leave the meeting but could not
say good-bye because he had to catch a plane. The following day,
DEVORE, using the "_____" address, sent an e-mail
to the UCE asking the UCE if he had any interest in "getting
together socially sometime" in order to "sort through this
aspect" of his life and to differ support. DEVORE and the UCE
then exchanged e-mail messages about meeting each other.

11.   On November 19, 2003, SA Kovar received information
from Yahoo! indicating that e-mail account _____
was registered to an individual living in _____, California.

12.   On November 19, 2003, DEVORE sent an e-mail to the UCE
stating that he could meet on December 5, 2003.  He said that he
missed "being with men of like interests."  DEVORE and the UCE
ultimately agreed to meet on December 5, 2003

13.   On December 3, 2003, DEVORE sent an e-mail to the UCE
confirming the *time and location of the meeting*.  He also gave
the UCE his work telephone number,

14.   On December 5, 2003, the UCE and DEVORE met at a
restaurant in Beverly Hills.  During their conversation, DEVORE
told the UCE the following:

a.   DEVORE is an ordained volunteer assistant minister
at the _____.  Previously, he had his

7

MAY BE PROTECTED - NOT TO BE REPRODUCED

LAO-00007

own church.  He also works as a supervising chiropractor for
interns who work at an AIDS clinic in

    b.   He is in regular Internet contact with a 14 year
old male who lives in Canada.  He had "online sex" with the minor
boy.

    c.   He had downloaded child pornography on his home
computer.  His computer is located at his residence and he does
not share the computer with anyone else.

    d.   He was caught with pornography on his laptop
computer owned by the chiropractic college where he teaches.  He
was not disciplined by the college.

    e.   He was currently seeking a 12-step sexual
addiction program because of the amount of time he spent chatting
on the Internet and viewing pornography on the Internet.  He had
not viewed any pornography websites on the Internet in the past
three days.

    15.   On December 30, 2003, DEVORE sent an e-mail to the UCE
in which he wrote, "I've been running from my own BL tendencies.
I've wanted to leave it behind, yet I stay in almost daily
contact with the young man in Canada.  I'm not sure if I'm
running toward sanity or away from a wonderful opportunity."  SA
Hoffer has informed me that based on her training and experience,
the term "BL" stands for "boy lover."

    16.   DEVORE and the UCE exchanged additional e-mails in
which they agreed to meet again on January 9, 2004.  On January

8

MAY NOT PROPERLY GOVERNMENT · IS NOT REPRODUCED

9, 2004, the UCE met with DEVORE at a restaurant in Beverly Hills. During that conversation, DEVORE told the UCE the following:

a. He was still attending the 12-Step Sexual Addiction Program and had not masturbated. He destroyed "lots" of his pornography that was on "zip drives." He said that consisted of child pornography and mostly adult pornography.

b. He was participating in sending Christmas cards to NAMBLA members who are incarcerated. He received a picture from one of the inmates depicting Santa Claus with two minor males, approximately six years of age, sitting on Santa's lap, with their genitals exposed. DEVORE said that the six year old was "well hung." DEVORE said that this picture was "a little creepy for me" and it seemed "inappropriate."

c. DEVORE told the UCE that he had not communicated much online with the 19 year old male. The boy told DEVORE that he was going to look for someone around his age, but said he thought it would only be temporary and he might "end up" being with DEVORE. Although he thought scared DEVORE, he had similar thoughts.

d. DEVORE told the UCE that he was still a boy lover.

e. DEVORE had traveled to Encinitas to meet the 16 year-old that he had met on the Internet. They went to Balboa Park in San Diego where DEVORE rented a room. They engaged in sexual conduct in the room. On the boy's 17th birthday, DEVORE

9

MAY NOT BE PROPERTY GOVERNMENT — INADMISSIBLE SHOULD NOT BE REPRODUCED

again rented a room and had sex with the boy.  Recently, since
the boy turned 18 years old, DEVORE met with him again for sex.

   f. He had suspended contact with the 14 year-old in
Canada, but he might begin communicating with him again.

   g. He had also "chatted" online with a 16 year-old.
After DEVORE wrote sexually explicit material to the 16 year-old,
the minor masturbated.. DEVORE did not masturbate in order to
maintain his "sobriety" for the 12-Step program.  DEVORE said
that if "someone dropped into my lap, I'd have to deal with
that."

   17. On January 0, 2004, DEVORE sent an e-mail to the UCE
confirming the date, time and place for their next meeting, on
February 13, 2004.  DEVORE sent the UCE a "couple of stories."
One story, "One More Bananas," described a man engaging in
sexually explicit conduct with a twelve-year old boy.  The story
states, "Better than seducing a boy is allowing a boy to seduce
you."

   18. On February 13, 2004, the UCE met with DEVORE at a
restaurant in Beverly Hills.  DEVORE told the UCE the following:

   a. He was ___ years old, and was born on ___

   b. He has a been a member of NAMBLA for four years.

   c. He was no longer attending the 12-Step program
because the groups' definition of sobriety does not allow for sex
with anyone other than a spouse, and the group does not approve
of gay relationships.

SCANNED - MAY BE IMPROPER FOR REPRODUCTION - GOVERNMENT'S NOT REPRODUCED

LA0-00010

10

d.   DEVORE stated that he has an iMAC computer and that he has owned it for five years.  He has additional equipment which allows for the enhancement of graphics and imaging.  uses a cable modem that makes "downloading pictures a snap.  had deleted sexually explicit images of minors that were his computer by pressing "delete."  He said that images that were on his computer would be of interest to law enforcement.

e.   DEVORE said that the relationship with the boy in Canada had become a friendship because DEVORE was not interested in spending money to fly to Canada to meet him.  He said that minors can give consent to have sex in Canada at age fourteen, but they have to be eighteen years old to give consent to have anal sex.  DEVORE said that he was not sure if he was a BL, but he would have sex with a 14-year-old if he was not going to get caught.  He said he could not satisfy a young boy, because of "physical limitations."  He would "have to find a young child that was happy with not a whole lot going on from [his] end."

19.   On February 18, 2004, SA Hoffer obtained the following information from DEVORE's California Driver's License records: date of birth           , height     ",    pounds, brown hair, hazel eyes.

On February 23, 2004, DEVORE sent an e-mail to the UCE asking about meeting on March 26, 2004 for dinner.  said that he was "verbally assaulted" by the boy from Canada that he

11

LA0-00011

MAY NOT BE REPRODUCED — INTERNAL INVESTIGATORY DOCUMENT

communicates with online.  He said, "sometimes I think this BL is a crock of shit, and other times I realize it's such a part of me."

21.  On February 29, 2004, the UCE sent an e-mail to DEVORE stating that he could meet DEVORE on March 26, 2004.  On March 22, 2004, DEVORE sent the UCE an e-mail asking if he would like to meet another BL for dinner.  Ultimately, the UCE was unable to meet DEVORE on March 26.

22.  On April 12, 2004, the UCE sent DEVORE an e-mail apologizing for not contacting him due to his traveling.  The UCE also wrote that he had problems with his computer, and had recently obtained a new computer.

23.  On October 8, 2004, the UCE sent DEVORE an e-mail informing him that he was working in San Diego, and could meet DEVORE in Orange County when he was there for work.  The UCE and DEVORE exchanged addition e-mail messages, and agreed to meet on December 17, 2004.

24.  On December 1, 2004, the UCE telephoned DEVORE at to discuss their meeting on December 17, 2004. DEVORE recalled that the UCE said that he had lost some pictures stored on his computer.  DEVORE asked the UCE if he was interested in a Compact Diskette (CD) with "some pictures" that he made.  When the UCE said that he would, DEVORE said he would bring the CD with him when they met.

25.  On December 17, 2004, DEVORE met with the UCE at a

MAY NOT BE PROPERLY REPRODUCED / PROPERTY OF U.S. GOVERNMENT

12

LA0-00012

restaurant in Los Angeles.  During that conversation, DEVORE told the UCE the following:

      a.  He met an eleven year-old boy on the Internet. During the course of the chat, they each used a webcamera (webcam) and simultaneously masturbated on camera.  A webcam is a video camera that Internet users can connect to their computer to send video images to another user on the Internet.  A webcam allows for "real time" transmission of those video images. DEVORE said, "we sat there jerking off together".

      b.  His preference is for boys ten or eleven years old, and he sees himself as a boy lover.  He said that "one of my fantasies has been to be with someone like that [referring to his on-line contact with the eleven year old] and I figure that's as close as I can get without. . . . I would never do that in my....., get with an eleven year old boy."  He added, "After I did that, I was so glad that I had done that, that it was something that I wanted for a very a long time and it was the closest I could get to having what I didn't get when I was that age."

    26.  During their meeting on December 17, 2004, DEVORE gave the UCE a recordable Compact Disk (CD-R) with the title, "Youth4Bob."  DEVORE was observed driving from the meeting in a vehicle, license number      , registered to DEVORE at the Subject Premises.  Later, the UCE left a message for DEVORE at      .  The UCE thanked DEVORE for the CD that  DEVORE gave to him earlier in the day.

LA0-00013

MAY NOT BE GOVERNMENT PROPERTY - INTERNAL USE - DO NOT REPRODUCE

27.  On December 18, 2004, the UCE and DEVORE's spoke by telephone.  DEVORE said that he did not take the pictures stored on the CD that he gave to the UCE, but that the pictures were taken on webcameras.

28.  On or about January 27, 2005, Investigative Analyst (IA) Monique Bueno examined the CD-R that DEVORE gave to the UCE, and found that an image depicting a minor engaged in sexually explicit conduct matched an image contained in a child pornography magazine named "Chicken Supreme."  The magazine provides a publishing address located in the Netherlands.  The image found on the CD depicts what appears to be a nude prepubescent male masturbating and being masturbated by another male.

29.  On or about February 1, 2005, United States Postal Inspector Robert Draper advised that DEVORE is currently receiving mail at California, the Subject Premises.

30.  On February 4, 2005, W. Mark Herrick, Director of Data and Network Security for Adelphia Communications confirmed that Adelphia provided cable and Internet services to DEVORE at the physical location of California, the Subject Premises.

31.  On February 8, 2005, SA James Durie, a Computer Analysis Response Team member trained in computer forensics, examined the CD that was provided to the UCE by DEVORE.  SA Durie

MAY NOT BE REPRODUCED WITHOUT PERMISSION OF THE GOVERNMENT

14

LA0-00014

advised that the volume was created and modified on December 6, 2004 using the computer software program, Roxio.  On the CD is a computer file, Thumbs.DB, that allows the viewer to open up multiple images.

32.  On February 8, 2005, SA Mon searched his information about "DB," which is a file extension that can be used for both Windows-based and MacIntosh-based systems.  In addition, according to Roxio website, Roxio products include software that can be used for Windows and MacIntosh based systems.

33.  Based on the training and experience of SA Hoffer, and her knowledge of this investigation, SA Hoffer believes that it is likely that DEVORE is a collector of child pornography.  She formed this opinion regarding DEVORE based on his statements to the UCE that indicate his longstanding interest in minor boys.  SA Hoffer further believes the following:

Individuals who collect child pornography usually keep and cherish it, and they rarely dispose of their child pornography.  They typically keep it for years, and will not be without it for long periods of time.  These materials are usually maintained in a secure place, most often a residence, to avoid detection by law enforcement.

Individuals who collect child pornography often correspond and/or meet others to share information and materials, rarely destroy correspondence from other child pornographers, conceal such correspondence as they do their sexually explicit

15

LA0-00015

FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription _____04

On 2/13/2004, SA _____ while acting in an undercover capacity met with Jeff DeVore at A Gilatt ___ 806 S. Robertson Blvd, Beverly Hills, telephone 310 5___8069. The meeting was recorded.

DeVore said that he is no longer attending the 12-Step program. He had an issue with the group's definition of sex being limited to a "spouse" thus precluding gay relationships.

DeVore has an iMAC computer that he has owned for five years. Once he began attending the 12-step program in December he deleted images on the computer by simply pressing "delete." DeVore said that images that were on the computer would be of interest to law enforcement. He accesses the Internet through his cable TV line.

DeVore is not sure whether he still considers himself a boy lover. He said that if a 14 year old boy were at an apartment and he could have sex with the boy without getting in trouble, he would do it for the experience but did not feel like he had to.

DeVore has been a NAMBLA member for four years.

____re is ___ years old and was born on _____.

DeVore was seen leaving in a vehicle with California license _____.

MAY NOT BE REPRODUCED. MY PRODUCTION ___ AND REPORTED U.S.

LA0-00061

Investigation on ___/13/2004 ___ at Los Angeles, CA

File # _____ Date dictated 2/13/2004

by SA _____

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# EXHIBIT H

**25 years!**

## I'M OUT, KIND OF

*by an attendee of the 2003 New York conference:*

Fear, real fear is the only way I can describe the emotion that ran through me as I walked around the Main Concourse of Grand Central Station. Do I go or don't I? I had traveled over 3000 miles and now I was debating in my mind whether to complete the journey by walking another 100 feet to the Dining Concourse.

Three months prior to this night, I had received an e-mail inviting me to attend the general membership conference that was being held in New York City in early November. I sent the registration fee and marked my calendar. Even then I knew I might not fulfill my commitment, but I took that first step. Several clients lived in The Big Apple and I could easily combine "business" with "pleasure." No one, except for a few "special young friends" know of my interests and desires, desires that I lived with for more than three decades. I've been lucky. A few people may have suspected. Once I was "forced" to quit the boys loved and loved me too, but a coaching assignment because of an "alleged" incident that neither I nor my young friend would confirm. I have never admitted my interest to family or friends. A short-lived marriage provided the perfect story I told my friends that I didn't date because of the trauma brought on by the divorce. No one questioned my desire to coach. I was good. I knew the game and the boys loved me and loved me too, but not in the same way, way "I"



I decided that one conference might be the time to openly admit, at least to fellow BLs of my true desires. I told friends I was attending a "seminar" and no one questioned my reasons.

Other thoughts, I walked around the Main Concourse. New friends waited below, but I wasn't quite sure. Finally, I summoned the courage to continue. As I walked down the ramp and turned toward the appointed meeting location, my attention was immediately drawn to four uniformed police officers. They were standing within 25 feet of men I knew or at least suspected of being fellow attendees. Was this a setup? I "knew" these cops were just waiting for me to join the group and then they would pounce, outing me and ruining my closeted life. I made a quick right and headed in the opposite direction straight toward the restrooms, debating once again whether to fulfill the promise I made to myself to finally meet other BLs. I remembered 9/11 and soon realized uniforms were everywhere. They were concerned with terrorism, not an organization protected by the 1st Amendment.

With my "courage" again restored, I walked up to the group, introduced myself and began three days of a continuing journey toward understanding myself and my desires.

The conference was everything I expected and more. Although I was reluctant to share too much of my own life and had a nagging fear that the next time the door to the conference room opened, the police would be entering, I relaxed like I have never relaxed before. I was surrounded by thirty men of all shapes and sizes, from all walks of life and every political spectra. We shared, however, a special love.

This was our organization's 25th Anniversary. Men who had been around from the inception shared special moments of our cherished history. Men who had been on the front lines spoke of the highs and lows of our fight. For me the weekend was all I had hoped. I believe I was looked upon with suspicion by some because it was my first time, but others opened their arms and their hearts. I now know that BLs exist, that they think like me and they act like me.

I left that weekend committed to the cause and knowing that next year I'll be back with old friends and the chance to meet new ones.

❖



## Letters Policy

Unless permission is specifically given to do otherwise, full names of letter writers will not be printed. Letters may be identified by first name or initials in place.

Opinions expressed in the letters column do not necessarily reflect NAMBLA's positions. Letters are presented in the spirit of a free and uncensored forum of ideas.

Letters may be edited for length or clarity.

Say what's on your mind! Write to:

*NAMBLA Bulletin*
PO Box 174, Midtown Station
New York, NY 10018 USA.

email: arnoldschoen@hushmail.com

**LA0-00074**

# EXHIBIT I

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   07/~~~~~4

On 7/13/2004, SA _____ while acting ___ a__
undercover capacity mailed the below printed l__ter to _hr_s
Maloney at NAMBLA, PO Box 174, Mi_town Sta_ion ___, NY 10___. This
letter was in response to a lett__ M_loney w_o_ ____ ___ has been
made a part of the 1A section of _his _il_.

Chris,

I received your letter and am glad so_one is takin_ charge __ th_ pam__let project. Thanks for doing that. Being in California makes everything so __tan_. You'_ luck_ to be in New York and close to all the action.

I'm still interested in helping __ whate_er way _ _an, _do have som_ health problems so it isn't always easy to get too committed. Pete_ may have given y_u __ _ I have already written on "Privacy." I submitted it to Peter and the _ther_ on the co__it_ee a_d __ _r heard another word. I'm assuming you have the names of th_ committee_members an_ _hat __ _have done on the project.

As I told Peter, I have _cc_ss to a hotel in_San Diego _wh_e I booked an investment seminar. They owe me and actua_l_ I ca___t a_uite of rooms for free __ I book them by the end of the year and not during peak vac_tio_ _riods _t wo_ld have be_n ideal for this year's convention but I guess we're going to Flor_d_ instead. If you _ere _ntere__ _ _uld take advantage of this offer and we could maybe have _he p_phlet pe_ple me_t __ for _eekend before the Membership Convention. Lots of young _tan__d bo_ies in s___ Souther_ _lifornia. Something to think about. Just let me know.

By the way _y _ey _ddress is: Rober_ _allace
_ _95_ _or_e Centre Dr.
S_ _ _105-166
S_ _ _iego, CA 92122-5542

Be safe.

MAY NOT BE REPRODUCED U.S.

LA0-00075

| | | |
|---|---|---|
| Investigation on | 7/13/2004 at | San Diego, CA |

File # _____    Date dictated   7/13/2004

by   SA

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# EXHIBIT J



# *We're Meeting in Miami*

## *November 12...*

MAY NOT PROPERLY BE REPRODUCED

**N**AMBLA conferences present wonderful opportunities for members to know their organization, to meet new friends and to renew old acquaintances. Our General Membership Conferences set our mission, purposes, goals, structures, and strategies. They also address today's specific issues for our movement.

Miami is a delightful city for us to meet, and November is a delightful time of the year to be there. We have reserved a block of rooms in a charming Art Deco inn at very reasonable rates. The hotel will also be the venue for our meetings. The cost for the three nights of our conference including conference fee will be $275. This low price is for double occupancy rooms. Unless you specify otherwise, we will assign you a roommate. Breakfasts and lunches are included. *Details will be mailed upon receipt of your payment.* Wife, Sustaining and Supporting members may subtract $25. Conference attendees must make sure their memberships are current.

The general membership conference is the governing body of NAMBLA and the only one authorized to make policy changes. Your participation and input, therefore, will be invaluable. Please include any propositions you wish to be considered. We will attempt to the best of our ability to disseminate all submissions to registered participants in time for the conference.

Please respond right away. There are major conventions going on in Miami at the time of our conference, making hotel accommodations difficult. To this effect our reservation guarantee has a strict time limit. More precise details of the conference venue and program will be sent upon receipt of your registration. We look forward to hearing from you soon.

### * * *

**T**he dolphin is a Miami symbol, and boys and dolphins have always had a special bond in history and legend. **Legend:** Taras was saved from a shipwreck with the aid of a dolphin sent to rescue him by his father, Poseidon, god of the sea. Taras rode the friendly dolphin safely to shore, creating an enduring image in Classical art, and folk tales of friendships between boys and dolphins.



*PO Box 174 • Midtown Station • New York NY 10018*

LA0-00078

Please turn over

# EXHIBIT K

FD-302 (Rev. 10-6-95)

Filed 9/6/05



-1-

FEDERAL BUREAU OF INVESTIGATION

Date of transcription    01/05/2005

　　　A review was conducted on electronic audio tapes recorded during the NORTH AMERICAN MAN/BOY LOVE ASSOCIATION (NAMBLA) annual conference, in Miami, Florida. Undercover Employee (UCE) attended the meeting in an undercover capacity.

　　　The following is a summary of events overheard during the first day of the conference, November 13, 2004:

Note - NAMBLA members are primarily known amongst their organization only by first name, and potentially the city and state they are from. For the purpose of this summary, members with an unknown last name will be referred to in this fashion:

(UI) = unintelligible

[10:58:03] - Recording begins

[11:03:02] - UCE walks into meeting in progress

[11:11:30] - The idea of having regional meetings, in addition to the national meeting, is discussed

[11:18:35] - JAMES (Miami, Florida) is elected by the group to facilitate the meeting

[11:19:51] - Agenda for the meeting is discussed

[11:28:00] - Break begins

[11:33:11] - Outdoor conversation begins during the break

The following is a transcription of a conversation between UCE, DAVID MAYER, TODD CALVIN, RICHARD STUTSMAN regarding traveling to have sexual relations with a minor:

MAYER:　　Boys right, I'd have a much better day walking on the beach looking at boys with a couple of you, going yum yum cute, yum yum cute and letting my imagination go.

CALVIN:　　Let's, let's, do politics a little bit and celebrate what we love for the rest of the time.

Investigation on　01/05/2005　at San Diego, California

File #　　　　　　　　　　　　　　Date dictated

by　SA MICHAEL G. SHANAHAN:mgs

LA0-00098

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

FD-302a (Rev. 10-6-95)

- - -

Continuation of FD-302 of _____ , On 01/05/2005 , Page 2

UCE:     Todd, have, have you traveled much? I mean, with your
         plane, is, is that a way in, to meet boys? Do you, do
         you do that?

CALVIN:  I do, but I, I, I, I am to give as I as kind of
         telling David

MAYER:   Yeah after (UI) went to bed we'd had that discussion,
         he and I and, I'd gotta play with his his chest.

CALVIN:  Who's that?

MAYER:   The guy with all the muscle

CALVIN:  Oh yea

UCE:     Oh.

MAYER:   I just wanna play with his chest.

CALVIN:  Full

MAYER:   Yeah I've gotta ask him, I'm sure he'll let me if I
         ask him.  Yeah the three of us had that discussion.

CALVIN:  But I don't, I don't have good, I have good gay-dar
         for many adults who are gay, or least I think I do, but
         for kids I just can't tell.  So no I'm not successful
         finding boys but yeah I travel a lot.  I'm flying
         around all over the place.  But I'm scared to death for
         one thing.

UCE:     [to MAYER] But you've had, you've had success?

MAYER:   Yeah, oh yeah, yeah, yeah.  I mean I've used, I, I've
         used my benefits from American to travel a lot.  You
         know, that's how I've made it to Southeast Asia
         literally five or six, you know, I'm embarrassed I
         can't even remember how many times I've been to
         Southeast Asia.  And to Mexico, and a lot of the other
         third-world countries.

CALVIN:  How 'bout you Robert, have you?

IN MAY NOT BE PROPERLY REPRODUCED SEE DOCUMENT

LA0-00099

FD-302a (Rev. 10-6-95)

UCE:    That's what we need to do, is just get together a travel group. Cause, when jokingly I mean it, this is the most paranoid group of people I've ever been around, and I mean, I'm cautious but it's like, OK, let's go, you know.

MAYER:    What I was going to say is what really frustrated me is when we were in there and someone said 'well we're not here to promote', it's like, then what the fuck are we here for? It's like, where's the travel bureau? Cause we were talking about that last night. We know that some of us, I mean, so get us that information. You know, I think we don't know who's lying to who, or if they're lying to, they're lying to themselves and saying this is all political, 'this is all to change society'. Bula shit, it's like, bring on the boys.

UCE:    [Laughs]

MAYER:    Sit in Daddy's lap. Sorry, sit in Daddy's lap

UCE:    [Laughs]

MAYER:    Daddy's got to be very wealthy, widower. Oops, sorry. I love you and I mean it.

UCE:    It, it's its medication time.

MAYER:    Here this will make you feel so much better. Lie down on the couch, it's easier for them to take you out. Don't go all the way upstairs, that (UI) will scratch the walls.

CALVIN:    But yes we were talking about ...

[11:36:0 ] airplane noise over muffled conversation

MAYER:    Three quarters of the guys are (UI) trying to (UI) boys

UCE:    ?

CALVIN:    I'll admit it.

MAYER:    Yeah, I

INADVERTENTLY NOT PRODUCED - TO BE PRODUCED AT A LATER DATE

LA0-00100

# EXHIBIT L

Re-Filed 9/1/05



FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    01/26/2005

An electronic mail (e-mail) message transmitted from
SAMUEL ALLEN LINDBLAD, e-mail address                    ,
social security account number          ., to Undercover Employee
(UCE)          ., e-mail address RobertCalifGuy@aol.com, is
included below. LINDBLAD is a member of the NORTH AMERICAN MAN/BOY
LOVE ASSOCIATION (NAMBLA). LINDBLAD'S message contains minutes
from a NAMBLA conference held in Miami, Florida, November 12
through November 14, 2004.

------------------------------------------------------------
------------------------------------------------------------

    Subj:    Re:   Minutes
    Date:    12/1/2004 1:41:34 AM Eastern Standard Time
    From:    Sam Lindblad <                    >
    To:      RobertCalifGuy@aol.com
    Sent from the Internet (Details)

Friend Robert,   Yes, I had a grand Thanksgiving and very fun
trip to CA after Miami.  But now it's quite chilly here.
Please check over these minutes and give me your comments.   I
have not sent them to Peter yet.  I have to locate his E-mail
address.  Oh dear!!!!!

So I'll hear from you soon.

MINUTES OF 2004 ANNUAL NAMBLA MEETING

November 12, 13, 14, 2004

Miami, Florida

Notes of Clarification: Names used are first names and state
abbreviations.

Decisions and discussions are listed under the agenda item they
pertain to, not necessarily in the order they happened during
the meeting..

Investigation on   01/26/2005   at  San Diego, California

File #                              Date dictated

                                                    **RPT-00198**

by   SA MICHAEL G. SHANAHAN:mgs

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

COPY

MAY NOT BE REPRODUCED
PROPERTY OF U.S.
GOVERNMENT

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ , On 01/26/2005 , Page ___2___

The annual NAMBLA meeting was convened by Peter NY in the Inn?s
Conference room attended by seventeen members of the
organization all in good standing. The introductions were as
follows:

Peter New York City, NY

Sam Albuquerque, NM

Tim Michigan, IL

David Chicago, IL

Mike Cleveland, OH

Dick Clemson, SC

John San Francisco, CA

Paul Orlando, FL

Todd Dallas, TX

Steve Pittsburgh, PA

David Miami, FL

Chris Chicago, 

Floyd San Francisco, 

James Miami, FL

Robert Los Angeles, CA

Sam Mi, FL

Bob Atlanta, GA

After introductions, Peter NY reminded participants of safety
issues to avoid self incrimination or passing along false
impressions only meant in jest.

MAY NOT BE REPRODUCED. PROPERTY OF U. S. GOVERNMENT

RPT-00199

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ , On 01/26/2005   Page   3

After a lengthy discussion the following agenda as outlined behind Roman Numerals was adopted.

James FL was elected by the group to facilitate the running of the meeting. Sam NM was delegated to take minutes.

During the morning break Peter NY sold some books and magazines brought with him. He stated in previous years he had brought more, but weight, travel constraints, and energy level had prevented him from the usual load.

A new volunteer to handle book sales is a priority.

I. Where We Are

—The purpose and policy statement of the organization was read and no changes were suggested. A copy of the constitution was not available, so it was not referred to during the meeting.

Membership Report: There are approximately 250 current members. It has been a steady decline over the past ten years. Writing to members when their membership has expired is a very time consuming job, but needs to be handled, and a volunteer found to do it. Two or three names are dropped per bulletin mailing.

—Financial Report: The organization's funds are "poor, but stable". After conference expenses all said there will be about $4,500 in one account and an additional $7,ooo-plus in another account. Having two accounts is for safety reasons, and the latter is used to fund other worthy causes like the ACLU.

Annual income and expenses usually run about $15,000. Income is generated through: memberships, voluntary contributions, book sales, fake member present to a practical jokes, endowments, and magazine sales.

Minutes, page 2.

Sells past issues of the Bulletin can be a very viable income if the volunteers were available to coordinate the project.

—Legal Actions: There is no legal action pending against the organization. Members of the styeering committee have been named in a suit funded by the Thomas Moore Foundation, because a former member of NAMBLA killed a child and a correlation between

MAY NOT BE REPRODUCED
PROPERTY OF U.S.
GOVERNMENT

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ , On 01/26/2005 , Page ___4___

the two is trying to be drawn. The Massachusetts ACLU is seeking
a summary judgement, and it appears like the law suit will
"peter out," be dropped soon.

II. Current Leadership

The steering committee is composed of six BI_s. They are as
follows:

Peter NY presiding officer

Floyd CA Bulletin Editor

Joe P Legal Expert

David

Chris IL News clipper and researcher

Tim

Several very active members have moved on to new projects. They
still remain financially supportive of the organization. The
organization has not had an archivist for several years. The
archives through 1992 are stored in various places around the
world. We are in need of filling this office. A book seller and
shipper is also badly needed.

Apprentices are greatly needed. They learn first at a low
level and gradually take on more responsibility.

A major theme of this agenda item was the burn-out of volunteers
and the need for reenergizing the steering committee.

III. What is expected of volunteer leaders in this organization:

The question of legal risks and vulnerabilities to volunteer
leaders was asked in may different phraseologies.

Peter NY responded with these guide lines to minimize personal
risk:

-Don?t break any laws.

-Work for personal financial independence.

MAY NOT BE REPRODUCED
PROPERTY OF U.S.
GOVERNMENT

RPT-00201

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ , On 01/26/2005 Page 5

-Value yourself. Don?t apologize for who you are.

-Be assured that the membership rolls are never shared or sold.

-Use a pseudo name when you write for the Bulletin or at any
other time you feel it would be wise.

-Read the pamphlet "What to Do If the FBI Comes to Your Door".
This needs to be reprinted.

-Use PGP on your own personal computer to encrypt/scramble your
E-mail. It is free soft ware. Spy Sweeper must be used along
with PGP or it is of no use.

-Consult an attorney with specific concerns. The steering
committee has a short list of BL friendly attorneys.

Peter NY also stated, "Risk is somewhat inevitable, not only in
working with NAMBLA, but in all we do. A community of supportive
individuals is so important. We must put our selves at risk if
we are to be supportive to each other and to new members. Each
volunteer must do their own personal risk assessment."

It was agreed that infiltration of the steering committee and
general membership can happen, but is unlikely because of
apprenticeships and the vigilance of the current leadership.

The steering committee is recognized to handle all communication
and PR with the press.

IV. Current Activities of the Organization:

The steering committee is struggling to keep up with membership
renewals, the Bulletin, the pen-pal program, Christmas card
program, and responding to lonely members writing in with
life-style concerns. Badly needed are an archivist, book seller,
correspondence secretary, computer whiz, and membership
secretary.

Dick S and Tim Il volunteered to work on the book sales
committee. Sam NM volunteered to do some book reviews. Any one
can do a review and submit it to the Editor under a pseudo name
if he so chooses.

Minutes, page 3.

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ , On 01/26/2005 page 6

V. Membership Recruitment:

Work is needed to re-energize the membership roll. Rick BC
agrreed to look in to magazines and publications that would
advertize for the organization. It was stated that at time
indivival members have paid for an ad in various magazines like
"Hand Jobs." It is important to code these types of ads so that
we know where our new membership requests are coming from. This
way we know what advertizing venues are effective.

Chris agreed to continue writing articles that will entice new
members.

The general membership is encouraged to seek out book stores
that are willing to sell the Bulletin. These names will then be
passed on to the steering committee.

It was noted that none of the internet/computer savvy members
were present at the annual meeting. This type of volunteer can
assist with the web page, and help in meeting todays techno
generation.

All members are encouraged to add their names to the Christmas
pen-pal list. The response to this program is tremendous. It was
noted that sometimes an inmate tries to take advantage of a
pen pal by making unreasonable request, but these can be
ignored. The pen pal can write under a pseudo name using the NYC
Address.

VI. The Bulletin

Floyd CA, the Bulletin editor, reported that approximately
$6,000 is spent per season on printing the magazine. He stated he
was very pleased with the printer contracted for the job. All
agreed that no changes should be made to the Bulletin at this
time. The newsletter sent to prisoners continues to be printed
without pictures and goes out under a separate name. It is
important support given to men who are suffering because of
social paranoia.

All present agreed that the money spent on the Bulletin is well
worth it. No changes were suggested. Floyd CA was commended for
his hard work and tenacity.

VII. Pamphlets Offered by NAMBLA

MAY NOT BE REPRODUCED
PROPERTY OF U.S.
GOVERNMENT

RPT-00203

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ , On 01/26/2005 , Page 7

Currently pamphlets on Religion and Ways to Respond to Religious
Zealots, the History of BL?s, and Famous BL?s are either
available or will be shortly. If the FBI Comes to Your Door
should be reprinted. Other subjects for pamphlets that can be
drafted by interested members are: coming out, responding to
media, how to handle arrests, age of consent issues, treating
kids as adults in the court system, and power differences. There
are many other possibilities that should be tackled.

A discussion of age of consent laws followed. It was noted that
if age of consent laws were abolished then the civil law might
take over and be even more volatile and expensive for BL?s. The
analogy was given, "When someone says sex for children, the
response is always, NO WAY. But when someone says baseball for
all kids, everyone says, OH YES. But what kind of baseball is
given to a four or five year old, that is given, must be age
appropriate, or it can prove to be very dangerous in both
situations. It was agreed that both sides of this issue can be
validated depending on the facts presented. A pamphlet should be
written and okayed by the steering committee on this subject.

VIII. Ways to change Society's Perception of BL?s

This agenda item was confronted throughout the three day meeting
and under each agenda item. No other specific guidelines were
given.

IX. State or Regional Meetings:

A long discussion surrounded a motion that was passed, but not
unanimously, to begin working toward regional work groups.
Discussion centered around:

-State chapters were disbanded some years ago after
inappropriate behavior was instigated at one meeting.

-The only way to re-energize the organization is through
regional work group efforts.

-How is anonymity protected?

-Where is the largest concentration of membership located?
(Never answered.)

MAY NOT BE REPRODUCED PROPERTY OF THE GOVERNMENT

RPT-00204

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____, On 01/26/2005 , Page 8

-Can?t a rogue individual at one of these meetings bring down
the whole organization.

-Getting together to see a movie or other recreational
activities are outside of the organization. Work groups would be
brought together only to complete an assigned task to further
the goals of NAMBLA.

It was moved and passed that a three member committee from
Florida meet within the next sixty days to begin writing the
guidelines for a regional work group. James FL, Sam FL, and Dave
FL agreed to get this task started.

Minutes, page 4.

One steering committee member will oversee the process. David FL
being from Florida, will not be the steering committee overseer.

When the committee completes its work the steering committee
will make further recommendation, or ask the committee to
proceed on with an actual work group project in the Florida
area. The steering committee will establish the list of names
that can be contacted for possible participation in this trial
regional work group. The results of this meeting and the Do?s
and Don?t of setting up the work groups will be reported at next
year?s annual meeting.

X. Tasks that can be done by the general membership to further
the goals of NAMBLA:

-Find outlets for the Bulletin.

-Help to recruit new member.

-Write book, movie or other appropriate reviews for the
Bulletin.

-Make yourself known as s an archivist, news clipper, attend
International groups like IPCI in Europe and report to the
steering committee.

-Write articles or create art work for the Bulletin.

-Volunteer for the pen pal and Christmas card programs.

MAY NOT BE REPRODUCED
PROPERTY OF U.S.
GOVERNMENT

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ , On 01/26/2005 Page 9

-Volunteer your computer expertise.

-Volunteer to translate NAMBLA?s materials into a foreign language.

-Create book marks that can be placed in library books of our genera.

-Be supportive to BL?s upon release from prison.

XI. Steering Committee Election:

This is the slate of officers now serving and the approximate number of years they have served on the steering committee:

1. Peter NY (25)

2. Floyd CA (23)

3. Joe (10)

4. David (6)

5. Chris IL (2)

6. Tim (12)

New members of the steering committee were nominated as:

7. Sam NM

8. David FL

The slate was elected in one ballot. Then a discussion ensued as to the proper way to elect the steering committee. The process was not required.

The steering committee meets as needed via telephone conference call usually on a Sunday evening.

XII. Annual Meeting of 2005:

It was agreed that the 2005 Annual Meeting would be in San Diego and will be organized by Robert CA. If members have specific ideas about next year?s planning, the ideas should be sent to

MAY NOT BE REPRODUCED. PROPERTY OF U.S. GOVERNMENT

RPT-00206

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of _____ , On 01/26/2005 Page 10

the steering committee and then your ideas will be forwarded to the proper person.

It was strongly suggested that the owner or manager of any facility that hosts our meetings even under the name Wallace Hamilton Press, be advised of our NAMBLA affiliation. We don?t want to be seen as sneaky, just cautious.

All agreed that meeting fellow BL?s was a positive experience.

The annual meeting was adjourned at 2:15 Monday afternoon.

Respectfully submitted,


Sam NM

Acting Secretary


RobertCalifGuy@aol.com wrote:
Hi all,

Just wanted to wish you all a happy Thanksgiving. Don't eat too much and be safe. I want to see all of you next year in San Diego.

Robert

---------- ---------- ---------- ---------- ---------- ---------- ----------
---------- ---------- ---------- ---------- ---------- ---------- ----------

MAY NOT BE REPRODUCED PROPERTY OF U.S. GOVERNMENT

RPT-00207