1            United States District Court

2           Southern District of California

3

4   UNITED STATES OF AMERICA,        )
                                     )
5                     Plaintiff,     )
                                     )
6        vs.                         ) Case No. 05-CR-0343 JM
                                     ) Judgment & Sentence
7   DAVID CARY MAYER,                )
                                     )
8                     Defendant.     ) Friday, August 11, 2006
    _____ )

9

10          Before the Honorable Jeffrey T. Miller
                 United States District Judge

11

12  Appearances:

13  For the Plaintiff:        Carol C. Lam
                              UNITED STATES ATTORNEY
14                            Anne K. Perry
                              ASSISTANT U.S. ATTORNEY
15                            880 Front Street, Suite 6293
                              San Diego, CA  92101
16
    For the Defendant:        Benjamin L. Coleman, Esq.
17                            COLEMAN & BALOGH
                              1350 Columbia Street, Suite 600
18                            San Diego, CA  92101

19

20

21  Official Court Reporter: Debra M. Henson, CSR, RPR
                             United States Courthouse
22                           940 Front Street, Suite 5190
                             San Diego, CA  92101
23                           (619) 238-4538
                             *courtreporterusdc@sbcglobal.net*
24

25          Record produced by stenographic reporter

1       San Diego, California - Friday, August 11, 2006

2           THE CLERK:  Calling item number 10 on calendar,

3    case number 05-CR-0343, United States of America versus David

4    Cary Mayer, on for PO report and sentence.

5           MS. PERRY:  Good morning, your Honor.  Anne Perry

6    on behalf of the United States.

7           THE COURT:  Good morning.

8           MR. COLEMAN:  Good morning.  Ben Coleman for

9    Mr. Mayer.

10          THE COURT:  Good morning.

11          MR. COLEMAN:  Good morning.  Your Honor, Mr. Mayer

12   is present.

13          THE COURT:  All right.  Mr. Coleman, are you ready

14   to proceed with sentencing this morning?

15          MR. COLEMAN:  Yes, your Honor.

16          THE COURT:  All right.  Dr. Mayer, I assume you're

17   still a licensed psychologist; is that correct, sir?

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  All right.

20          THE DEFENDANT:  Far as I know.

21          THE COURT:  Pardon me?

22          THE DEFENDANT:  To the best of my knowledge.

23          THE COURT:  All right.  Dr. Mayer, are you ready to

24   proceed with sentencing today?

25          THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  All right.  Mr. Coleman, have you

2     reviewed the probation report as well as the addendum to the

3     probation report with your client?

4          MR. COLEMAN:  Yes, your Honor.

5          THE COURT:  Okay.  I have reviewed those pleadings

6     as well as your sentencing memorandum, the letters you have

7     submitted, Mr. Coleman, the government's sentencing

8     memorandum, the request for a departure along with the points

9     and authorities you submitted, Mr. Coleman, the sentencing

10    summary charts.  I've considered the nature and circumstances

11    of the offense and history and characteristics of Dr. Mayer

12    as well as the advisory guidelines and the statutory purposes

13    of sentencing.

14         With respect to the objections, I know the

15    government's filed one objection related to a reference in

16    the PSR concerning an agreement for a 24-month sentence

17    where -- and I note that that is not the understanding of the

18    parties.  I think that in your objection, Ms. Perry, you made

19    reference to one point in the probation report, and I think

20    there are actually two -- two locations in the probation

21    report that need to be corrected.

22         MS. PERRY:  And I pointed that out, your Honor.  I

23    think the parties would agree that that was not the plea

24    agreement in this case; it was for --

25         THE COURT:  Yes.  Did you also see on page 4 that

1    you are -- that a 24-month recommended sentence is

2    attributable to you?  Page 4, line 15.

3            MS. PERRY:  Right.  Yes, sir.

4            THE COURT:  Okay.  And then there was the -- that

5    should be corrected.

6            MS. PERRY:  Sentence within the guideline range.

7            THE COURT:  I'm sorry?

8            MS. PERRY:  The plea agreement in this case called

9    for the parties to recommend a -- the parties to recommend a

10   sentence within the guideline range but that the government

11   would recommend a sentence within the guidelines.

12           THE COURT:  I know.  I'm just saying -- pointing

13   out there are two places in the PSR that need to be

14   corrected:  On page 4, line 15 and then on page 11, beginning

15   of line 17; I think that also needs to be corrected.

16               With respect to the objections by the defense, I

17   would adopt the corrections set forth in the addendum and the

18   responses as to all of the objections made by Mr. Coleman

19   with the exception of the objections related to the

20   recommendation for a fine and the objection to certain

21   supervised release conditions.  I will deal with those

22   objections during the allocution, Mr. Coleman.  I'm not

23   inclined to impose a fine for reasons I can state; and with

24   respect to the supervised release conditions, there are one

25   or more conditions I think that need to be modified a bit.

1   So we'll get to that a little bit later.

2              MR. COLEMAN:  Okay.

3              THE COURT:  All right.  Would you like to proceed?

4              MR. COLEMAN:  Yes, your Honor.  To begin with, I

5   think I'll just briefly address my request for a downward

6   departure, and then I really just want to get into Section

7   3553.

8              As far as the request for the downward departure,

9   it was based on imperfect entrapment, and I think the

10  government's response I think is essentially well, Mr. Mayer

11  was predisposed to committing this offense and therefore

12  there should be no downward departure.  And so it's our

13  position that the point of imperfect entrapment is that it

14  applies in cases where defendants are predisposed.  If he

15  wasn't predisposed, we obviously wouldn't be here and he

16  wouldn't be guilty of the offense and there would be no

17  sentencing.

18             The -- I think the Ninth Circuit has sort of

19  indicated that the imperfect entrapment departure applies in

20  sort of -- in unique cases where there are sting operations

21  where perhaps the government is a little bit aggressive in

22  instigating the conduct or the unusual circumstances about

23  the case.

24             I think in this case the -- it's not like the

25  typical sting operation in that in perhaps a typical sting

1  case, you know, the government's buying drugs from a known

2  drug dealer, and it's the drug dealer who's going through the

3  entire process of obtaining the drugs and doing everything

4  and then he is going to sell them to the undercover agent.

5        In this case it's the other way around; it's more

6  like a reverse sting almost.  It's the agent who was -- did

7  everything, supposedly found the place, was going to get

8  everyone together, tell everybody where to go, and basically

9  all Mr. Mayer had to do was show up.  So I think in that

10  sense, the case is a little bit different as far as a typical

11  sting operation.

12        I would also note that, you know, the relationship

13  that was developed between Mr. Mayer and the other defendants

14  and the undercover agent, there -- was a little bit different

15  than the typical relationship that develops in I think

16  perhaps a sting operation.  And so that there are -- there

17  are factors in this case which makes this a little bit

18  different I think than it would -- that would make it

19  appropriate for an imperfect entrapment departure.

20        That being said, I'd like to move on to the 3553,

21  which I think really is the heart of the matter, and I'd

22  really like to focus in on 3553 (a)(6), which is fashion a

23  sentence that is similar to other similarly situated

24  defendants, and I think that really is the factor that --

25  that looms large here.  I think Mr. Mayer is the last

1   defendant to be sentenced both in San Diego and Los Angeles,

2   so we have a little bit of a history here of what has

3   happened to other defendants.  And what I'd like to do is

4   first really focus in -- primarily focus in on the two other

5   defendants in this case.

6           It's my position that -- I think essentially

7   putting aside the legal issue that's been preserved -- and I

8   think that's a factor obviously for the Court to consider,

9   and I'll address that in a second -- but putting that aside,

10  just looking at the history and characteristics of the three

11  defendants, I think they're all similarly situated.  There

12  are certain positive aspects that each defendant had and

13  certain negative aspects that each defendant had, and I think

14  that when you weigh all of them, they -- they all turn out to

15  be pretty much equal.

16          In this case I think for reasons that I'm not

17  entirely clear, Mr. Mayer has kind of been viewed as slightly

18  more culpable than the other two.  He was the first one

19  listed in the indictment, he was defendant number 1, and

20  throughout the case, I've sort of gotten that impression that

21  perhaps Mr. Mayer's a little more culpable than the other

22  two, and I think part of it may have to do with my co-counsel

23  successfully deflecting things from their client onto

24  Mr. Mayer; I think a lot of that went on throughout the

25  process.  But I think when you -- when you analyze all the

1    different factors of the different defendants, they turn out

2    to be the same.

3          I would agree that Mr. Zipszer, defendant number 3

4    in this case, he was probably the least culpable as far as if

5    you look at the conduct in this case.  He was brought in at

6    the end.  I think the agent really pushed to have him join

7    the trip whereas Mr. Mayer and Mr. Calvin were much more

8    willing to go on the trip than Mr. Zipszer.  And if you look

9    at the actual offense conduct in the case, he's probably on

10   the tail end, although the bottom line is he agreed to do the

11   exact same thing that Mr. Mayer and Mr. Calvin did.

12         On the flip side is that Mr. Zipszer I think does

13   have some things in his past that are -- that are certainly

14   serious.  He had a prior misdemeanor conviction, and that's

15   not a big deal, but he does have a prior record, he had a

16   prior misdemeanor conviction, but he had incidents in the

17   United States in which -- he was I think a Big Brother to

18   somebody on one occasion and was maybe exploiting that

19   relationship, and he had another incident here in the United

20   States where he was sort of exploiting relationships in the

21   United States.  And so I think that that background is, you

22   know, is quite serious.

23         And one thing I did want to mention which I forgot

24   with respect to the imperfect entrapment, another thing that

25   I think makes this case a little bit different is that the

planned conduct was to go to a foreign country, and the --

and the information that the agent provided was that they

were going to go to a foreign country to a place where --

that was a safe haven where I guess this conduct was kind

of -- well, it was understood that it was going on and it

wasn't being -- and law enforcement wasn't enforcing it.  And

so I think that's another factor that makes this case a

little bit different than the typical sting operation; it

actually involved going somewhere else where perhaps the law

enforcement was not going to be enforcing this type of

behavior.

But in any event, getting back to the defendants,

that was Mr. Zipszer's situation.  Mr. Calvin's situation is

that he had both -- he didn't have any prior record either,

like Mr. Mayer, and I think that when you look at their

history and characteristics as far as their backgrounds,

there's a lot of similarities.  They both have higher

education, I think have excellent work histories and things

of that nature, so there's some similarities there.  But as

far as Mr. Calvin's prior -- Dr. Calvin's prior record, he

has engaged in a -- in a sexual act with a minor in Jamaica,

in a foreign country, and there was also indications in

discovery that he had had -- and it's not really clear what

happened -- but the potential relationship with an individual

in Texas here in the United States or that there was -- there

1  was -- I think it involved a situation at a health club where

2  he was getting to know an underage boy at a health club.

3  And, again, it's perhaps some exploitive relationship here in

4  the United States.  So he has that -- he has that history.

5  Mr. Calvin was also a long-term member of NAMBLA.  He

6  attended three conferences.  At his home were found a lot of

7  NAMBLA paraphernalia.  And also Mr. Calvin got a substantial

8  break in the sense that I believe that there was potential

9  child pornography found in his home, and he was not

10  prosecuted for that, and of course there's a mandatory

11  minimum of -- that's a mandatory minimum offense, and he

12  received a substantial break in that regard as well.  So he

13  had that baggage on his shoulders as well.

14         That brings us to Mr. Mayer.  Mr. Mayer, again, as

15  far as the history and characteristics, no prior record, I

16  think, you know, strong employment background, things of that

17  nature.  Admittedly, he had traveled to foreign countries and

18  engaged in sexual conduct with underage individuals, and he

19  has that background, and that's there.  I don't necessarily

20  think that the background is any worse than the other two

21  defendants.  And I'd also note that those were

22  prostitution-type situations, and -- none of it is right at

23  all, but I think that there is somewhat of a difference

24  between going to Thailand and engaging in a prostitution-type

25  situation where, if it's not legal -- I'm not sure what the

1   exact laws are in Thailand -- it is understood that that is

2   going on and that behavior is -- there's no enforcement of

3   that behavior.  And in Mexico where you also had some

4   conduct, again, it was an open gay beach where this was

5   openly -- this type of behavior was openly taking place.

6           It doesn't make it right, but I think when you look

7   at all the factors and you balance everything out, I think

8   the defendants are essentially the same; I don't think

9   Mr. Mayer is more culpable than the other two in any way,

10  shape, or form.  And that really -- what it means is the fact

11  that we litigated the First Amendment issue and we're

12  obviously preserving for the appeal -- and I recognize that I

13  think the defendants -- the other two defendants should get a

14  break for that; I mean they gave up a substantial issue, what

15  I believe is a substantial issue, and they should get a break

16  for it, there's no doubt about it.  The question is how much

17  of a break should they get compared to Mr. Mayer; I think

18  that's really the bottom line.  I've suggested three months.

19  Maybe the Court thinks it should be more, but I don't think

20  that there should be a really substantial difference in the

21  sentences between Mr. Mayer and the other defendants.  The

22  government's recommended 40 months as compared to the 24

23  months that the other two got; I just think that that's too

24  big of a -- I guess of a hit for litigating the issue.  It

25  was only -- I would also note that the other two defendants

1    filed motions, they litigated all the way up to the day of

2    the motion hearing and then pled guilty, so it's not like

3    they engaged in a super-fast-track type situation, and I just

4    don't think 16 months' credit is -- is fair in this case.

5          As far as supervised release is concerned, I

6    understand that the Court imposed 12 years on the other two

7    defendants, and I -- it's somewhat inconsistent for me to say

8    that Mr. Mayer should be treated differently; I think they

9    should be treated similarly, and I understand if the Court

10   wants to impose 12 years.  I did mention the seven years in

11   my papers, although I recognized that the Court would

12   probably want to go with the 12 years.  The reason why I

13   mentioned the seven years is because that's what the

14   defendants in the Central District got.

15         I also, having attended the previous sentencing, I

16   understood that the Court's willing to entertain perhaps a

17   request to terminate supervised release early if -- if things

18   were going well.  I guess I looked at it -- and perhaps the

19   flip side is that seven years could be imposed, and if things

20   aren't going well, it could be extended.  But that's pretty

21   much all I have to say.

22         As far as the conditions of supervised release, you

23   know, I cited the Weber case, which was that recent case that

24   dealt with the physiological testing of people in this

25   situation.  I do think that there needs to be, rather than

1   sort of a general blanket condition, which is what it is --

2   which is what is recommended, there needs to be more

3   specifics, and there needs to be much more the -- of a basis

4   for what testing is going to be done and why that particular

5   testing is going to be done based on the Weber case, which is

6   obviously a very recent Ninth Circuit case.  And that being

7   said, I don't think I have any more comments.  I know

8   Mr. Mayer wanted to address the Court, and I will certainly

9   entertain any questions the Court has.

10          THE COURT:  Thank you.  Dr. Mayer, you do have an

11  opportunity to make any statement you wish to make at this

12  time.

13          THE DEFENDANT:  Your Honor, thank you for allowing

14  me this time to address the Court.  I stand before you --

15  thank you.  Your Honor, thank you for allowing me this time

16  to address you in court.  I stand before you alone without

17  the support of my friends because I am mortified and ashamed

18  of my actions both in this case and in the past.  I did not

19  want to subject my friends to any further embarrassment.

20          I cannot and will not insult you by attempting to

21  justify why I would join an organization like NAMBLA or

22  engage in behavior that I have.  Suffice it to say one of the

23  main reasons why I pursued graduate work in social work and

24  psychology was an effort to help me better understand myself.

25          I've always had the need to belong to something or

1  someone.  I've always craved the concept of what a home

2  should be:  Security, comfort, safety.  However, the idea

3  that an organization like NAMBLA could possibly fulfill even

4  the smallest percentage of those needs was insane on my part.

5  In hindsight, I realize that an organization like NAMBLA is

6  abhorrent.  I can only claim temporary insanity for

7  belonging, even for four months.  It is impossible for a

8  minor to give consent or to fully cognitively understand

9  their actions at a young age.

10  There's no excuse for me or my actions, especially

11  with my educational background.  I have given myself a life

12  sentence.  Like Hester from Nathaniel Hawthorne's "Scarlet

13  Letter," I too will be a pariah for the rest of my life.  Not

14  only have I thrown away 25 years of education, but I have --

15  I will be treated like a leper in the 19th century.  Circles

16  -- social circles I once belonged to will no longer allow me

17  to associate with them.  No one will ever look at me without

18  first thinking of my actions.  I have done harm to friends

19  and organizations simply by being associated with them.  For

20  this I am truly sorry.

21  I'd also like at this time to thank my attorney,

22  Benjamin Coleman, not only for his willingness to represent

23  me so admirably and to fight for something that we both

24  believe is legally wrong regardless of his own belief system,

25  the organization, nor the persons he represents.  In addition

1    to his legal knowledge, I'd also like to thank Mr. Coleman

2    for making himself accessible to me and his gentle, humane,

3    and compassionate nature.  Thank you again, your Honor, for

4    allowing me time to speak.

5                 THE COURT:  All right.  Thank you, Doctor.  Ms.

6    Perry?

7                 MS. PERRY:  Your Honor, there are several issues.

8    We would urge this Court not to depart on the ground of

9    imperfect entrapment.  This Court has already ruled about the

10   legality of the actions that were taken in this particular

11   case, and I think also that there really isn't anything

12   unique once the Court takes into consideration its own ruling

13   and the facts that have been developed throughout the

14   litigation.

15                 In this case the Court has held that the agent

16   properly attended the NAMBLA meeting and that the resulting

17   investigation was also proper.  Dr. Mayer was the first

18   person to bring up -- and we put this in our papers; I don't

19   want to belabor the point, but we put this in our papers --

20   that Dr. Mayer was the first person to even bring up the

21   issue of foreign travel at the NAMBLA meeting, and I don't

22   think it's a small statement to say that he was the genesis

23   of this case, and I emphasize that in my papers.  There is

24   nothing unusual about the way the foreign travel came up in

25   this case.  An opportunity was presented, but it was only

1  after Dr. Mayer had indicated his interest in foreign travel.

2  You've heard today that there's been an admission, at least

3  through counsel, that he did engage in this type of foreign

4  travel to Thailand and to other parts of the -- other parts

5  of the world to engage in sexual activity with boys.  Based

6  on that, your Honor, the actions of the agent and everything

7  that occurred in this would not mount to an entrapment issue

8  that would cause this Court to even consider an imperfect

9  entrapment departure.

10         The other factors that this Court has been asked to

11  consider in fashioning a lower sentence -- the United States

12  is essentially recommending a sentence within the guideline

13  range as we reserved to do under the terms of the plea

14  agreement, and it has been asked of this Court to fashion a

15  sentence as to similarly situated defendants.  Just for the

16  Court's information -- you may already know this -- but

17  considering all seven defendants in this case, the sentencing

18  ranged from 24 months to 30 years, and I'm not saying that

19  Dr. Mayer's status is the same as the individual that got the

20  30-year sentence; that was Mr. Lindblad, who had an extensive

21  prior criminal history.

22         But as I also indicated in my papers, unlike the

23  other two defendants in this case, we seem to know more about

24  Dr. Mayer from his conduct than we do from his life.  Mr.

25  Coleman and I had a little brief conversation about some

comments that were made in the presentence report about

Mister -- Dr. Mayer establishing a residency in Nevada,

Missouri, and whether that was -- he was trying to hide

himself.  We don't really know.  I gathered that he had some

sort of a counseling practice.  What we do know about

Dr. Mayer is that despite his enormous amount of education

and despite the apparent support of enormously educated

friends, who, I would note, your Honor -- I was looking at

the letters they wrote -- these are individuals who, one

would assume, would be in a unique position to see the

problems that their friend was experiencing; all of them seem

to have extensive training in mental health, social work, and

things of that nature.  And the activities that Dr. Mayer and

the other defendants in this case were involved with were

very, very serious, apparently so deeply hidden from their

friends and family that -- this Court has heard from other

defendants -- nobody seemed to know what was going on.  And

Dr. Mayer was doing this apparently in the presence of

licensed professionals who should be able to even analyze

this conduct.

It's interesting to note that Dr. Mayer has told us

today that one of the reasons he received this extensive

training in mental health and social counseling was to

investigate his own motivations and his own problems.  This

is probably the first time we've heard this from Dr. Mayer

during the course of this investigation, and we've heard a lot more about him I think this morning than we knew until up to this date. What we knew up until this date was that he was an extensive traveler. He had a job that, unlike any of the defendants except -- defendant Calvin had an airplane -- but Dr. Mayer has been a -- an employee of American Airlines for more than 20 years and apparently used that to his advantage to exploit children.

I would note for the record, to just to keep things straight, there were no items of child pornography found on anybody's computers in this particular case. I believe there were in the Los Angeles defendants, and they were punished accordingly.

Mr. Coleman has also mentioned the fact that Dr. Mayer has reserved his right to litigate the issue. That's absolutely true, and I don't think it's appropriate to punish him for litigating that issue. On the other hand, the fact that the defendants -- the co-defendants chose to withdraw their challenges to an issue which apparently both Dr. Mayer and Mr. Coleman find to be very meritorious and is an actual attack on the whole investigation and the legitimacy of that I think should be taken into consideration by this Court.

Your Honor, we have recommended a sentence within guideline range. I believe probation recommended 41 months.

1   We did recommend 40 months, and we did for the following

2   reasons:  His ability to travel, the fact that we do view him

3   as the genesis of this case, and even the Court said in its

4   order in this case that it recognized the fact that the

5   comments of Dr. Mayer that then resulted in the development

6   of what turned out to be a trip to San Diego in February of

7   2005.

8          Dr. Mayer has given us some indication this morning

9   that he has some awareness of his situation, but we didn't

10  hear that really until today.  He is an experienced traveler.

11  He has a long road to hoe in this case.  Similarly situated

12  defendants in the Los Angeles area received sentences of

13  around 37 months.  I would note for the Court -- I don't know

14  if you knew this also -- but they did not engage in the type

15  of litigation that we had here by any of the defendants.

16         I noted also that Dr. Mayer referred to the fact

17  that what happened in this case was legally wrong.  It would

18  be the position of the United States that this Court has made

19  its ruling of what happened was not legally wrong, and I

20  think based upon all the factors in this case, this Court

21  should impose a sentence within the guideline range, award

22  zero departures, and impose a sentence of supervised release

23  of 12 years.

24         THE COURT:  All right.  Thank you.  I'm going to

25  start with the advisory guidelines, and they are agreed upon

1    by the parties with the exception of the departure request

2    made by Mr. Coleman.  But the base offense level would be a

3    24 here.  There would be a three-level downward adjustment

4    for acceptance of responsibility.

5           With respect to the departure request for imperfect

6    entrapment, I am going to deny that in the discretion of the

7    Court.  Separately and independently from my denial of that

8    in the discretion of the Court, I would say that in my view,

9    my order in March of this year addressed many of the points

10   you made, Mr. Coleman, with respect to the entrapment

11   argument you've made today.  It may have been in a slightly

12   different context; it may have -- that is, the order may have

13   addressed the legality and propriety of what was done in this

14   case by way of investigation, which naturally included

15   arguments that you've made in connection with imperfect

16   entrapment, but I would incorporate the order that I issued

17   in March of this year in relation to the challenges to the

18   government's conduct in this case as a further basis for the

19   denial of this departure request.

20          Looking at the advisory guidelines, we are dealing

21   then with a total offense level of 21, the criminal history

22   score is zero, which is a category I, and the advisory

23   sentencing range would be 37 to 46 months.

24          In my view, looking at some of the 3553 (a)

25   factors, this was a very serious offense.  As I have said

1   before in connection with the sentencings of Dr. Mayer's

2   co-defendants, society has a great interest in preventing and

3   punishing sexual predation of minors.  A minor does lack the

4   maturity to consent to such acts, and for anyone -- as I said

5   earlier -- and now this may not be that much applicable to

6   Dr. Mayer -- for anybody to delude themselves into thinking

7   that minors can actually consent to this kind of exploitation

8   indicates an individual, in my view, that is bereft of

9   rational thinking in this area.  For the first time,

10  Dr. Mayer, that I've seen anywhere in connection with what's

11  been submitted to me by way of papers or argument, you seem

12  to be acknowledging that this morning, and I think that that

13  is a very important thing for you to acknowledge, that this

14  is a -- it's a crime, it's a crime of violence, and it's

15  against someone who is vulnerable and has no ability to

16  consent in any way, shape, or form legally or otherwise.

17          You have acted on this impulse in the past -- and I

18  think that's been acknowledged today -- through your trips to

19  foreign countries.  I know that this came up in your

20  conversation with the agent in this case, and I have no

21  reason to believe that this was being done by you on an

22  ongoing and continuing and regular basis, notwithstanding

23  your ability to fly, to access foreign countries as a flight

24  attendant for an American airline carrier.  One would think

25  that given the manner in which you were making these comments

concerning your history, almost in a boastful way, that if in fact this had been a regular pattern on your part, there may have been more of an indication by you in some of these conversations that you had with the agent.  Nonetheless, the propensity that you had coupled with your access to people in foreign countries, minors in foreign countries, underscored the risk that you posed to minors and perhaps still do pose to minors, notwithstanding your acknowledgement today that these are individuals who really lack any meaningful ability to consent.

So looking at all of the behavior here, the nature of the offense, what was contemplated, the history, this certainly is a very serious matter, and I've taken into account the letters -- I've read them very carefully -- the letters submitted from your friends, and certainly they're glowing in many respects, but they don't mitigate in my view what was done here in this case and what the history has been.

As I said with the co-defendants' sentencings in this case, and I think what was pointed out in the PSRs in connection with those individuals, this case has resulted in rather intense publicity in the relevant communities, and as is the case with your co-defendants and your circumstance, apparently no one has come forward from your local community to accuse you of any conduct here; I think that was something

that was pointed out in the sentencings of your

co-defendants, and I think out of fairness to you, Dr. Mayer,

that should be pointed out here.  Once again, it does not

mitigate the seriousness of the offense here, but it is a

factor I think that should be pointed out.

          I also take into account -- and this relates to

your own history and characteristics aside from the

seriousness of the offense -- the collateral damage that your

life will sustain.  You've spoken to that somewhat.  This is

a bit of a mitigating factor.  Your future employment is

seriously in doubt.  I would be very surprised if your

professional licenses are not revoked.  Furthermore, I would

think that your career with the airline carrier is in great

jeopardy given the contact that's foreseeable between flight

attendants and minors, sometimes minors traveling unattended;

I would think that all of that is in jeopardy.

          In my view, the need for deterrence here and to

promote respect for the law and also to protect the public,

those three sentencing purposes of the 1984 Sentencing Reform

Act, more or less coalesce in this area to warrant a

significant sentence, within the guideline range but all the

same a significant sentence.  I think the need for deterrence

and sending a proper message and protection of the public and

minors is certainly very, very important in this case.

          Taking into account all of the factors that I've

enumerated here, I would find that a low-end guideline

sentence would be appropriate, which would be 37 months.  I

think the low end of the guideline range when considered in

conjunction with the sentencing factors of the 1984

Sentencing Reform Act is the indicated sentence here.  I

think it would represent a fair, just, and reasonable

punishment.  I also would find that when that sentence, which

is a three-year sentence essentially, is combined with a

12-year period of supervised release with a rigorous regimen,

society is further protected as well.

So for the reasons I've indicated and pursuant to

the 1984 Sentencing Reform Act, it is the judgment and

sentence of the Court that you, Dr. Mayer, be committed to

the custody of the Bureau of Prisons for a term of 37 months.

I am not going to impose a fine.  The reason I am

not going to impose a fine, notwithstanding the

recommendation of probation predicated upon the conclusion

that you have a viable ability to maintain your earning level

in the future where it's been in the past, I feel for reasons

I've already stated, your earning potential has been severely

diminished as a result of this conviction.  And I am going to

impose the $100 special assessment in this case.

Following completion of the custodial sentence in

this case, Dr. Mayer will be placed on a 12-year period of

supervised release with the standard conditions of

1   supervision applying as well as the following special

2   conditions, and I'm going to take some time in going over

3   these because I think they are important; there may be some

4   modifications here.

5           With respect to the first condition of supervised

6   release, Dr. Mayer is to complete a sex offender evaluation,

7   which may include periodic psychological/physiological

8   testing and completion of an appropriate assessment at the

9   direction of the Court or probation officer, and that

10  defendant participate and successfully complete an approved

11  state-certified sex offender treatment program.  That is

12  where I would end that first sentence of the first condition

13  of supervised release.

14          The next phrase consisting of the following

15  language, quote, including compliance with lifestyle

16  restrictions and treatment requirements of the program, end

17  quote, would be deleted I think for the reasons indicated by

18  Mr. Coleman; that's a very -- those are very broad statements

19  "with lifestyle restrictions and treatment requirements of

20  the program," and so I would delete that language.  At the

21  same time, Mr. Coleman, I would indicate to you that

22  suggestion that all of the testing protocols -- if you're not

23  directly suggesting that, I think you're implying it -- that

24  the protocols, the tests themselves, what will be required in

25  detail be set forth here I think is something that would be

1  unwarranted and very, very cumbersome.  In light of Weber,

2  the recent Weber case -- and I know counsel are familiar with

3  that -- the Court is going to retain jurisdiction to make any

4  appropriate modifications for the purposes of making sure

5  that conditions not only as articulated but as implemented

6  are reasonably necessary for appropriate supervised release

7  requirements.

8        And that brings us to the second special condition

9  of supervised release.  By the way, I am going to include the

10 last sentence in number 1 that is included:  The defendant

11 shall allow reciprocal release of information between the

12 probation officer and the treatment provider and pay all

13 costs associated with this treatment.

14       I am adopting the second condition as it stands:

15 The defendant shall participate in a program of mental health

16 treatment specifically related to sexual offender therapy.

17 The defendant shall enter, cooperate, and complete any such

18 program until released by the probation officer.  The

19 defendant shall abide by all program rules and regulations,

20 including participating in any clinical psychosexual testing

21 and/or assessment at the direction of the probation officer

22 or therapist.  Now, once again, I want to emphasize that in

23 my view, in light of -- in light of Weber, just in light of

24 common sense, these conditions have to be reasonably

25 necessary for the diagnosis, the care, and treatment of

Dr. Mayer.  I cannot in any way envision what all of the
testing they require and what tests may cross the line and be
violative of the principles set forth in the Weber case as
articulated by Judge Noonan, I simply cannot do that, but
this Court or any other Court, for example, if the
supervision is going to be transfered to another district,
would retain jurisdiction over that.

Further, with respect to the second limitation, the
defendant shall take any and all medications as prescribed by
a psychiatrist or physician, not discontinue the use of any
medications without medical authorization, and the Court will
authorize the release of presentence report and available
psychological evaluations to any mental health provider in
charge of the care and treatment of Dr. Mayer as approved by
probation.

With respect to number 3 -- to the extent you had
an objection to this, Mr. Coleman, I am going to overrule the
objection -- and the third restriction would be the defendant
shall not use a computer, recording device, facsimile, or
similar device to access child pornography, including
Internet access; and defendant shall consent to random
inspection of the computer and to the installation of
computer software that will enable the probation officer to
monitor computer use on any computer owned, used, or
controlled by the defendant.  The defendant shall pay for the

cost of the installation of the software.  And the defendant

shall not possess or use any data encryption techniques or

program.

Now, with respect to the fourth special condition,

it reads as follows:  The defendant shall not have contact

with any child under the age of 18, including contact via

telephone, Internet, or mail, unless in the presence of a

supervising adult who is aware of the defendant's conviction

in the instant offense and with prior approval of the

probation officer.  The defendant shall immediately report

any unauthorized contact with minor-aged children to the

probation officer.  I am going to overrule any objection to

the fourth special condition here as it has just been read.

Now, at the same time, let me say this -- and this was a

consideration that came up in the sentencings of the

co-defendants -- this restriction, in my view, does not

include Dr. Mayer being in proximity to any such minor as a

result of Dr. Mayer's mere presence in, for example, a place

of public access; this restriction is directed to any direct

contact with a child, with someone under the age of 18, where

defendant would be interacting with a child.  So to give you

an example, if he's in a retail store and waiting in line to

pay for some goods he's about to purchase, and a 12-year-old

boy comes up right behind him to stand in line, Dr. Mayer

doesn't have to get out of line and abandon his purpose in

being there; that's not the intention of this particular restriction.

Fifth:  The defendant shall not knowingly associate with or have any contact with any sex offenders unless in an approved treatment and/or counseling setting.

Sixth:  The defendant shall not be employed or participate in any volunteer activity that involves contact with children under the age of 18 except under circumstances approved in advance and in writing by the probation officer.

Seventh:  The defendant shall consent to third-party disclosure to any employer or potential employer concerning any restrictions that are imposed by the Court.

Eighth:  The defendant shall register with the state sex offender registration agency in any state where the defendant resides, is employed, carries on a vocation, or is a student as directed by probation.  The probation officer will provide the state officials with any and all information required by the state sex offender registration agency.  The defendant shall register with the state sex offender registration agency in any state where the defendant resides throughout the period of supervision.  This requirement includes any state where the offender may reside, work, or is a student.

Further, the defendant is not to possess firearms, explosive devices, or other dangerous weapons; and is to

1    submit to a search of person, property, vehicle, abode, or

2    residence at a reasonable time under reasonable circumstances

3    by a probation officer; and finally, the defendant is not to

4    travel internationally without the permission of the

5    probation officer.

6              Finally, Dr. Mayer, I want to get to the -- your

7    appellate waiver here, which is as follows:  Save and except

8    for what I will advise you in just a moment as to what you

9    have reserved for appeal, given the manner in which you have

10   been sentenced, you have waived your right to appeal or in

11   any other way attack or challenge both the conviction based

12   upon your plea of guilty to this offense as well as to the

13   sentence imposed, as I say, with the following exception:

14   You are reserving for appeal the adverse ruling or rulings of

15   this Court on March 12 of 2006 denying your motion to dismiss

16   the indictment on the bases of First Amendment violation and

17   outrageous governmental misconduct.  Do you understand that

18   except for your preservation of the appellate rights on the

19   ruling of this Court on March 12, 2006, you have waived your

20   appellate rights as I indicated to you?

21             THE DEFENDANT:  Yes, your Honor.

22             THE COURT:  All right.  I would further advise you

23   that if it is your intent to appeal -- and I know it is --

24   that you must file a written notice of appeal within ten days

25   from today.  That notice of appeal must be filed with the

1    Clerk of this Court, that is, the U.S. District Court for the

2    Southern District of California, rather than with the Clerk

3    of the Ninth Circuit Court of Appeals.  The notice should

4    specify what it is you are appealing from.  If you cannot

5    afford the services of legal representation while your case

6    is on appeal, those services will continue to be provided to

7    you without cost.  I do emphasize that you keep the appellate

8    authorities advised of your whereabouts at all times while

9    your case is on appeal so that if they do need to be in touch

10   with you, they can contact you.  Do you understand what I

11   have told you about your appellate rights?

12             THE DEFENDANT:  Yes, your Honor.

13             THE COURT:  All right.  Mr. Coleman, did you have

14   anything further?

15             MR. COLEMAN:  Yes, your Honor.  I had filed a

16   motion to appoint appellate counsel.  I don't believe

17   Mr. Mayer can afford a appellate lawyer at this point.  He

18   was originally deemed suitable for appointed counsel.  He

19   then retained me but is no longer able to retain me.  I think

20   the information in the presentence report substantiates this

21   and, in particular, as the Court pointed out previously, his

22   ability to -- to really earn any income in the future is

23   seriously in doubt.  His -- obviously his educational

24   background is -- that's all gone; he's not going to be

25   allowed to work in that sector.  I've been in constant

1    communication with American Airlines, and that job is gone

2    too.  So he's really looking at nothing.  All he has --

3         THE COURT:  Has that already happened?  Is that

4    just your Midas touch, Mr. Coleman, or has American Airlines

5    told you that --

6         MR. COLEMAN:  Well, I'm certainly not trying --

7         THE COURT:  -- Mr. Mayer --

8         MR. COLEMAN:  -- to get him fired, but -- I don't

9    know about Midas touch, but they've all but told -- they've

10   suspended him already, he's been obviously suspended, and

11   they've all but told me that it's over.  I mean as far as I

12   know, they haven't taken official action yet; I think they're

13   waiting for the final resolution of the district court

14   proceedings, but I don't see that going anywhere.  He has --

15   he has some money in a retirement account, but he also has

16   $150,000 of student loans, and --

17        THE COURT:  Well, that was a little bit -- you

18   know, I saw that, I saw the figure that you -- that you

19   proffered to the Court relative to the student loans.  But I

20   know that probation looked into that, and they secured a

21   balance that was a lot less than what was proffered; it was

22   something in the range of $30,000, give or take, as a balance

23   for student loans even though you were proffering something

24   in the area of $100,000.

25        THE DEFENDANT:  I would much rather go with theirs,

1   but it's --

2          THE COURT:  May have been that originally, but

3   apparently you've made some substantial progress in the --

4   well, I don't want to speak for probation.  If there was a --

5   Ms. Fallon-Westerheide, if you'd like to speak for yourself.

6          USPO FALLON-WESTERHEIDE:  Thank you.  Your Honor,

7   on behalf of my colleague, Mr. Miller, there was a financial

8   background check, there was some financial records looked

9   into, and those records did reflect about a $24,000 balance

10  for student loans.

11         THE COURT:  Good news, Doctor.  Okay.  You were

12  thinking it was $100,000?

13         THE DEFENDANT:  At least.

14         THE COURT:  Okay.  Ms. Perry, did you wish to be

15  heard?

16         MS. PERRY:  If I could weigh in on this just

17  briefly, your Honor.  Obviously Mr. Coleman has the extensive

18  knowledge and background on this case, and he should be

19  appellate counsel.  The only concern that I had was -- and

20  this happens frequently in our courtroom -- that someone is

21  deemed to be appropriate for appointed counsel in part

22  because actually when they come through the door, we know so

23  little about them.  We actually did know a little bit more

24  about Dr. Mayer because his then-attorney, Ms. Franklin,

25  actually allowed him to be interviewed by pretrial services,

1 and at that time there was a substantial amount of bail

2 offered to be posted.  We are just asking perhaps that a

3 separate financial affidavit be submitted to the Court, and

4 maybe the Court can evaluate that.  Temporarily of course Mr.

5 Coleman can certainly appoint -- or can represent him for

6 purposes of filing the necessary appellate documents, but

7 based upon -- Mr. Coleman's touched upon this fact -- I

8 realize that in the great scheme of life that Dr. Mayer may

9 not mean that much, but he apparently does have a 401(k) with

10 a substantial sum of money in it, and that's more than a lot

11 of appointed folks have.

12        THE COURT:  Well, I don't know that you've got your

13 application before the proper court at this point.  I think I

14 could provisionally appoint you to -- you're retained counsel

15 at this point, aren't you?

16        MR. COLEMAN:  Through the trial court proceedings.

17        THE COURT:  Yeah.  I mean that hasn't changed up

18 until now.  I think your present status is retained counsel.

19 I would certainly appoint you provisionally at this point at

20 least to perfect the notice of appeal.  You say you've

21 already filed a notice of appeal?

22        MR. COLEMAN:  No, I have not.

23        THE COURT:  Okay.  I would hope not, but in any

24 event -- it would have been a little early.  I can certainly

25 provisionally appoint you as counsel of record at least for

purposes of perfecting the appeal, and then any request you

may have for a further appointment, a permanent appointment

for appellate purposes, can either be brought to the

attention of this Court or to the Ninth Circuit, whatever

would be appropriate under the circumstances.  But I think

there should be some kind of formal application made before

the Court.

       MR. COLEMAN:  Okay.  I did file a written motion

for it, and --

       THE COURT:  I saw that.

       MR. COLEMAN:  Okay.

       THE COURT:  That's fine.

       MR. COLEMAN:  You want a written affidavit or --

       THE COURT:  Well, I think whatever -- whatever your

client would have to submit to the Court initially where he

could qualify for representation by counsel off the panel I

think would be, at least at a minimum, would be required in

connection with any motion.  So I'm not going to take any

action on the motion you have pending before the Court,

though you did file it; I think it needs to be addressed

further either before me or before the Ninth Circuit,

whatever would be appropriate under the circumstances.

       MR. COLEMAN:  Okay.

       THE COURT:  Okay.  Anything further?  Did you want

to dismiss, Ms. Perry?

1       MS. PERRY:  We would dismiss remaining counts.

2       THE COURT:  Okay.  This is a conviction on Count 2,

3  so the remaining counts of the indictment would be dismissed

4  as to Dr. Mayer.

5       MR. COLEMAN:  Your Honor, as far as filing -- if I

6  do file the motion in this Court -- I think probably there's

7  a good chance that Dr. Mayer is going to be shipped out of

8  here.  Should I notice any particular time or just file it

9  without any time and you'll just rule on the papers?

10       THE COURT:  I think that -- yes, I would just

11  notice -- you can check with the courtroom deputy on setting

12  up an appropriate date for that to be heard.

13       MR. COLEMAN:  Okay.

14       THE COURT:  Would you come forward, Mr. Coleman.

15  I'd like to give you a copy of the terms and conditions of

16  supervised release, standard and special.  If you would

17  kindly provide those to Dr. Mayer at this time.  Let the

18  record reflect that Mr. Coleman is providing the conditions

19  of supervised release to Dr. Mayer.  Thank you.

20       MS. PERRY:  Thank you, your Honor.

21     (The proceedings were concluded.)

22

23

24

25

Certificate of Reporter

I hereby certify that I was a duly appointed, qualified, and acting Official Court Reporter for the United States District Court at the time of reporting the above proceedings; that the foregoing is a true and correct transcript of the proceedings had in the mentioned cause on the date or dates listed on the title page of the transcript; and that the format used herein complies with the rules and requirements of the United States Judicial Conference.

Dated January 27, 2017 at San Diego, California.

                              /s/ Debra M. Henson  (electronic)
                              Debra M. Henson
                              Former Official Court Reporter